**Dr. Burl DILLARD, Plaintiff-Respondent,**

v.

**Raymond E. ROWLAND et al., Trustees of Barnes Hospital, and Barnes Hospital, a corporation, Defendants-Appellants.**

**No. 35870.**

Missouri Court of Appeals,
St. Louis District,
Division One.

Dec. 17, 1974.

Motion for Rehearing or Transfer to Supreme Court Denied Feb. 7, 1975.

Application to Transfer Denied
April 14, 1975.

Bryan, Cave, McPheeters & McRoberts, Robert G. Brady, Greenfield, Davidson & Mandelstamm, John L. Davidson, Jr., Robert M. Hamlett, St. Louis, for defendants-appellants.

Rosecan & Popkin, St. Louis, for plaintiff-respondent.

WEIER, Judge.

Plaintiff Burl Dillard, a physician and surgeon, filed suit against the defendant Trustees of Barnes Hospital because of their failure to retain plaintiff on the medical staff of Barnes Hospital when the annual appointments were made effective June 30, 1969. In Count I of the two count petition, Dillard sought to have the court declare that the Trustees abused their discretion in failing to retain him on

the staff; then, upon making this determination, to compel the Trustees to permit plaintiff to admit and treat patients in the hospital. In Count II Dillard sought to establish an oral contract with the defendants, and to enforce the terms of it by compelling the defendants to reinstate him as a member of the medical staff. Each count sought money damages. By consent of all parties, Barnes Hospital as a corporation was added as a co-defendant with the named Trustees, and entered its appearance. Trial was commenced on October 30, 1972, and after many days devoted to hearing testimony, judgment was rendered on November 2, 1973 in favor of plaintiff and against the defendants. By this judgment, defendant Trustees were ordered to reinstate plaintiff as a member of the Barnes Hospital medical staff retroactive to and as of June 30, 1969. They were further ordered to permit plaintiff to admit, treat, operate upon and otherwise care for patients without being required to be a member of the faculty of Washington University School of Medicine. Plaintiff Dillard was further awarded a money judgment against the defendants in the sum of $45,000.00. From this judgment the defendants have appealed. We reverse.

In order to understand the issues that have been presented, we first examine the institutional structures and the relationship between Barnes Hospital and Washington University which provide the background and the stage upon which the factual scenario of this case has been played.

The individual defendants are Trustees of a charitable public trust under which they operate Barnes Hospital in St. Louis, Missouri, for the benefit of "sick and injured persons". This trust was provided in the will of Robert A. Barnes, admitted to probate in the City of St. Louis on April 5, 1892. Following an analytical study and critique of medical education at Washington University and other medical schools published by Abraham Flexner in 1910, the Board of Trustees at Washington University under the leadership of one of their members, Robert S. Brookings, made a comparative investigation of the quality and methods of medical instruction at their institution. This resulted in a restructuring of the medical school with the heads of various departments being put on a full-time basis with their salary being paid by the University. During this period of re-evaluation and change at the University, the Trustees of Barnes Hospital became satisfied that the efficiency of a hospital depended upon the ability of its medical staff and that a hospital could render better service to its patients when it had associated with it an organized medical school and scientific staff with laboratories and a dispensary. And so in 1911 the Trustees of Barnes Hospital entered into a contract with Washington University whereby a medical school and a hospital were to be constructed beside each other in the City of St. Louis and each institution would work with the other to their mutual benefit. As part of the original agreement, the Trustees of the hospital agreed that the medical staff of the hospital would consist solely of the teaching corps of the medical department of the University. In successive contracts, one executed November 17, 1949, and the current contract executed December 2, 1964, in effect during most of the times referable to this litigation, this same clause was retained. Over the years additional hospital buildings were built by Barnes and a number of hospital buildings were constructed by the University. For operational purposes, under provisions of these same contracts, the Trustees of Barnes administered all of the hospitals and managed their fiscal affairs on a consolidated basis. The annual net income was divided one-half to Barnes and one-half to Washington University. In the event a loss should occur, the University was to pay half of the loss.

In addition to the agreement, the Trustees of Barnes adopted by-laws which provided that when a member of the medical staff ceased to be a member of the faculty

in the School of Medicine of Washington University, his appointment to the medical staff of the hospital terminated simultaneously without any action by the Trustees. The director of the hospital, with the concurrence of the chief of the service involved, could also suspend or limit the privileges of a member of the staff prior to the end of a calendar year for which the staff member had been appointed. Such a dismissal required notice and a hearing if requested.

The medical school was divided into "departments" and the hospital staff into corresponding "services". There were thirteen services at the hospital and the chief of each was appointed by the Trustees on recommendation by the University. He was invariably the chairman of the counterpart department of the medical school. This was also in accord with the Barnes by-laws. A joint medical advisory board or committee composed of the chiefs of the various services, the director of the central diagnostic laboratories, two representatives elected by the Barnes and allied hospital society and others, functioned as an advisory board to the Board of Trustees on all matters relating to the medical staff and the welfare of the hospital and its patients.

With respect to appointments to the faculty of the medical school, they were made annually upon the recommendation of the chairman of each department of the school through whom all nominations were required by University practices to pass. Although a department chairman could be questioned or overruled with regard to his recommendation, appointment or reappointment to the faculty status in the past invariably had followed his recommendation.

Under the by-laws of Barnes Hospital, nomination for membership on the medical staff was presented on a form approved by the hospital which stated the qualifications and references of the nominee. It was presented by the chief of the sponsoring clinical service to the director of the hospital who in turn transmitted it to the joint medical advisory committee. This committee, after investigation, made a recommendation which in turn was presented by the director of the hospital to the Board of Trustees.

The faculty of the medical school in general has been divided into two classes, one of which was denominated "full-time" and the other "part-time". Full-time faculty members had as their primary interest research and teaching, but they also engaged in private practice of a limited character. They were paid a salary by the University and all of their fees from patients and other compensation reverted to the University. In addition to their salary, the full-time faculty received many other valuable benefits paid for by the University such as: contributions to their retirement annuity; premiums for their medical, disability, accident and life insurance, along with premiums for their liability insurance; membership fees in medical societies and their expenses in attending medical meetings and conventions; office space in the Barnes Hospital complex along with their supplies, secretarial and nursing assistance; and tuition benefits for the education of their children at Washington University.

Part-time faculty members, who are also known as "clinical" faculty members, received no compensation from the medical school, but derived their entire income from private practice and devoted only a portion of their time to teaching. Such part-time faculty members brought to the hospitals and medical center their private patients who served for clinical instruction to students in the school of medicine, and incidentally paid the hospital's charges for the use of its facilities to help to keep the hospital functioning. They have admitted about 85% of the patients in Barnes Hospital.

In addition to the two classes previously described, a hybrid class of faculty member was assigned to state and municipal hospitals, principally the Ellis Fischel State

Cancer Hospital in Columbia, Missouri, the City Hospitals, and Veterans Hospital in St. Louis. These members of the faculty were paid either some part or all of their salaries by the institutions to which they were assigned rather than by the school of medicine. By this affiliation, clinical instruction was afforded to students of the school of medicine in these hospitals where these members of the medical faculty served.

We turn now to the facts which gave rise to this litigation. Plaintiff, Burl Dillard, received his degree in medicine from the medical school of the University of Texas. He then completed five years of training at Barnes Hospital serving successively as intern, assistant resident, and chief resident in surgery. He was certified by the American Board of Surgery. Following this service, on June 1, 1963 he went to the Ellis Fischel Cancer Hospital at Columbia, Missouri, where he served as an assistant surgeon for six months. His salary was paid by the United States Public Health Service and the State of Missouri. When he went to Ellis Fischel he was also appointed staff instructor of surgery at Washington University Medical School for the same year. He was not paid anything by Washington University at that time. In December, 1963 Dr. Carl Moyer, who was surgeon-in-chief at Barnes Hospital and Chairman of the department of surgery at Washington University arranged for plaintiff to come to St. Louis to meet with him and with Dr. William Cole to discuss the filling of a vacancy at the St. Louis City Hospital. Dr. Cole was associate professor of surgery at the University and director of the department of surgery at City Hospital. A tumor clinic was operated at the City Hospital under the auspices of the University. Following a series of discussions and meetings, plaintiff Dr. Dillard and Dr. Moyer entered into an oral agreement which, according to the plaintiff's testimony, embraced the following terms and conditions: plaintiff would become a salaried employee of the City of St. Louis and

perform the duties of director of the tumor clinic at City Hospital under the direction of Dr. Cole; Dr. Moyer would arrange for plaintiff to be appointed to the faculty of the medical school as an instructor in surgery without salary from the University; Dr. Moyer would arrange for plaintiff to be appointed to the surgical staff of Barnes and St. Louis Children's Hospitals, and plaintiff would be allowed to engage in private practice at those hospitals and retain the fees earned, giving priority, however, to the performance of his duties at the tumor clinic; and after one to three years if plaintiff's performance as director of the tumor clinic met with complete satisfaction of Dr. Cole, then upon plaintiff's request Dr. Moyer would recommend that plaintiff be given a part-time appointment to the faculty at which time, and at plaintiff's option, he could resign as director of the tumor clinic. No memorandum in writing was made by the plaintiff, Dr. Moyer, Dr. Cole, or anyone connected with Barnes Hospital or the University at the time. But later on May 23, 1968, Dr. Moyer (who was deceased at the time of trial and who had not previously given a deposition) prepared and forwarded to Dr. Dillard at Dillard's request a written memorandum introduced into evidence as an exhibit by plaintiff. This substantially followed the testimony of Dr. Dillard except that, as Dr. Moyer related, Dillard would be limited in the number of patients referred to him by other staff members at Barnes and St. Louis Children's Hospitals. Almost immediately after the plaintiff moved to St. Louis, and just as had been promised him, the University appointed him to its medical school faculty and he was in turn appointed as a member of Barnes' surgical staff. Soon, because of his skill, other physicians at Barnes started referring patients to him when surgery was indicated. About ninety to ninety-five percent of the surgery that plaintiff performed at Barnes was referred to him by other physicians of the Barnes medical staff.

In the beginning of his career in St. Louis, the plaintiff had used Barnes' private doctors' offices and had paid Barnes for the use. His effort to rent space in Queeny Tower was rejected. But the full-time faculty were given space there and it was paid for by the University. Plaintiff also paid for his telephone and materials. He received no salary from the University nor any of the other benefits given full-time members of the surgical faculty.

When he moved to St. Louis and commenced working at the City Hospital in January of 1964, he started on a salary of $12,600.00 a year. By devoting time to private practice he earned additional income that year of $23,508.68. In 1965, in addition to his wages from the City Hospital, he grossed $53,825.34 from his private practice. In 1966 his professional gross was $73,462.73. In 1967, in addition to his wages at the City Hospital, he grossed $81,821.00. In his first year in St. Louis, aside from Barnes and St. Louis Children's Hospitals, he obtained appointments on the staffs of St. John's Mercy, St. Joseph's, and Lutheran Hospitals, and treated patients in those hospitals.

In the meantime, Dr. Carl Moyer resigned in June, 1965 as surgeon-in-chief at Barnes and chairman of the department of surgery in the medical school, and moved to Michigan. After an interim temporary appointment to that post, in July, 1967 the University appointed Dr. Walter Ballinger as chairman of the department of surgery, and the Trustees of the Hospital appointed him surgeon-in-chief. On May 6, 1968, Dr. Ballinger called Dr. Dillard to his office and informed Dr. Dillard that it would be impossible to keep him on in the same capacity that he had served during the preceding years, and suggested that he go on a salary with Washington University School of Medicine. The suggested amount of the salary was $22,000.00 a year, but Dillard had netted more than $80,000.00 from his practice in 1967 and refused to entertain this offer. Dr. Ballin-

ger was adamant about refusing to allow plaintiff to continue under the old arrangement and in a series of correspondence between the two it became evident that Dr. Dillard would not agree to a full-time appointment which would cause any income generated by his private practice to revert to the Department of Surgery of the University. In his reply to Ballinger's offer, Dillard stated his preference to keep his arrangement with the University as he had done in the past, but if that arrangement was impossible he then elected to exercise what he termed an option made to him in the agreement with Dr. Moyer to have a clinical appointment in the department of surgery effective July 1, 1968. This would classify him as a part-time instructor on the staff of the University and would entitle him to appointment to the Barnes Hospital staff. To this Ballinger replied that he would be pleased to have Dillard stay as a member of the full-time faculty under the same conditions as other members of the faculty in the department of surgery. He further pointed out that the arrangement under which Dillard was currently working was not in conformity with the concept of full-time faculty status and asked for a decision to accept or reject the offer. In the meantime, it was learned that on March 31, 1968 the plaintiff had been routinely reappointed to the faculty for the academic year July 1, 1968 to June 30, 1969, so the terminal date was changed to June 30, 1969. In subsequent correspondence in October of 1968, Dr. Ballinger again wrote plaintiff and stated that he did not intend to recommend Dr. Dillard for reappointment to the faculty of the University.

By letter of June 13, 1969 Dr. Dillard was advised by Dr. M. Kenton King, the dean of the medical school, that his appointment expired on June 30, 1969 and that the executive faculty of the medical school did not recommend that he be reappointed. It was suggested that if Dr. Dillard wished to have a hearing concerning this matter that he send a written request. This request for a hearing was made by

Dr. Dillard by letter of June 16, 1969 along with a request for a written statement of the grounds for his dismissal. Dean King replied by stating the University's provost was in the process of appointing a panel to hear his complaint. As to reasons, King stated chief among the considerations for not recommending reappointment was that, contrary to the policy of the University, as a full-time faculty member, Dillard had entered upon an extensive private practice of surgery which he intended to continue. But on July 14, 1969, Dillard's then attorney wrote Dean King advising him that since the hearing would not be held by a representative body of Dillard's peers but rather by one appointed by the University administration, it would serve no useful purpose to have a hearing upon his claim. Thereafter, suit was filed and the case tried.

From the unfavorable judgment against the defendants they have appealed, urging numerous contentions of error against the court's finding and judgment. The first contention is directed toward sustaining the validity of the agreement between Washington University and the Trustees of Barnes Hospital dated December 2, 1964, and heretofore described, wherein the hospital agreed that the medical staff of the hospital "shall consist solely of the teaching corps of the University's School of Medicine". This, of course, is an important feature of the contractual relationship between Barnes Hospital and Washington University Medical School. Without it, Barnes would lose its position as a teaching hospital. It is one of the unique features which is not only reasonable but also necessary for the successful operation of Barnes in that capacity and was considered reasonable and necessary by a number of outstanding expert witnesses whose testimony was not contradicted. Although plaintiff by his counsel at time of trial, in his brief and at time of argument, conceded that it was not unreasonable to require faculty status by stating he did not contest the reasonableness of the relationship be-

tween Barnes and Washington University in that respect, it was an issue of the pleadings, and the court in its findings of fact and conclusions of law determined that the failure to reappoint plaintiff indicated that the Trustees had abdicated an important part of their inherent duties pertaining to the selection and maintenance of their hospital's staff. The judgment mandated that the Trustees reinstate plaintiff without requiring plaintiff to be a member of the faculty of the Washington University School of Medicine as provided in the contract between the two institutions. The question, therefore, as to whether this clause in the contract was an unlawful surrender of the power of the Trustees has been and is an issue in the case.

The issue as to whether the contract of affiliation was a reasonable exercise of discretionary powers of the Board of Trustees of a similar public charitable trust was raised in the case of Taylor v. Baldwin, 362 Mo. 1224, 247 S.W.2d 741 (Mo. banc 1952). There, plaintiff attorney general sued the trustees of Barnard Free Skin and Cancer Hospital to enjoin the affiliation of that hospital with Washington University Medical Center. The same phrase, that is, "that the medical staff of the hospital shall consist solely of the teaching corps of the Medical School of Washington University * * *" was contained in the contract between Barnard and Washington University Medical School. In that case the memorandum opinion of the trial court contained findings of fact and conclusions of law setting out that the plan as proposed would require all future appointees to the medical staff to be members of the teaching corps of the medical school of Washington University. Against the contention that the right of the Board of Directors of Barnard to determine the acceptability and desirability of the members of the staff was nullified by this provision, the trial court said it could not be overlooked that in the final stage of selection the person recommended to the medical staff had to be approved by the Board of

Directors of Barnard. The fact that the nominee must also receive the approval of other groups did not in that court's opinion take away the right of the Board to select members for the medical staff.

On appeal, the court in *Taylor* recognized that those charged with the responsibility of the operation and government of a public charity must exercise the discretion vested in them, but further stated that the court would not substitute its judgment and discretion for that of the Board unless the members were guilty of misconduct, the charity was impossible of execution, it was about to fail, or its purpose had been or was about to be perverted. Taylor v. Baldwin, *supra*, 247 S.W.2d at 750 [7]. As to the contention of claimed surrender of powers, the court in *Taylor* pointed out that under the affiliation contract recommendations for staff membership would come from the joint medical advisory committee and, unless and until approved by Barnard's Board, no such appointment to Barnard's staff would be made. In the contract between Washington University and Barnes which is before us, a similar provision recites that the joint medical advisory committee composed of the heads of clinical services and other members of the professional administrative staffs of the hospital and clinics shall recommend to the Trustees for appointment all nominees for membership on the medical staff of the hospital, and such appointment shall become effective when approved by the Trustees of Barnes Hospital, by the executive faculty of the medical school, and by the Board of Directors of Washington University. Just as in *Taylor*, we have concluded that final and full authority is in the Barnes Board of Trustees to name or to refuse to name any doctor as one of its staff members. It is true that this doctor must be a member of the teaching corps of the University school of medicine, but this does not in itself destroy the discretion of the Board of Trustees in making the final choice.

In determining that this clause contained in the agreement between Barnes and the University and the by-laws of Barnes was void and unenforceable, the trial court was in error.

Having determined the validity of the contractual relationship between the hospital and the University within the terms of which plaintiff performed his services and obtained his affiliation with Barnes, we pass to the issues which have been raised concerning the breach of the alleged contract established by plaintiff with Dr. Moyer which the lower court found to be valid and binding upon the Trustees of Barnes Hospital.

The court below determined that Dr. Moyer, when he entered into the oral contract as previously testified to by Dr. Dillard, had authority to make such agreement with the plaintiff, Dr. Dillard. Likewise, the court concluded that Dr. Ballinger was acting as agent for the defendant Trustees when he refused to reappoint Dr. Dillard to the faculty of the University and indirectly to the surgical staff of Barnes Hospital. Thus, all of the acts and statements of Dr. Moyer in support of the oral agreement with Dr. Dillard, and the subsequent acts and statements of Dr. Ballinger in refusing to suggest or nominate the reappointment of Dr. Dillard to the University staff and in turn to the Barnes staff were held to be the acts of the defendant Barnes Hospital and its Trustees. The defendants contend that Dr. Moyer had no authority to appoint, or to promise to appoint, or reappoint Dr. Dillard, or for that matter anyone else, to the faculty of the school of medicine, or to the staff of Barnes Hospital. They further contend that no one at the University or Barnes Hospital in authority had ever ratified, approved or acquiesced in the agreement of Dr. Moyer. They further urge that neither Dr. Ballinger nor the University was acting as the agent of the defendant Barnes Hospital or its Trustees in refusing to reappoint plaintiff to the faculty of the medical school

after June 30, 1969, and consequentially to the medical staff of Barnes Hospital.

A review of the record reveals that there is no evidence which indicates that the Trustees of Barnes Hospital ever authorized Dr. Moyer to make any such commitment in violation of the Trustees' contractual agreement with Washington University. This commitment was conditioned upon Dr. Dillard's performance at a tumor clinic in the City Hospital with which Barnes had no connection and over which it had no control. There is no evidence that anyone in authority at Barnes Hospital had any knowledge of any contract or promise such as that testified to by plaintiff or found by the trial court to have been made, and there was no evidence that the Trustees ever ratified, approved, or acquiesced in the making of such a contract. When the plaintiff was appointed to the staff of Barnes Hospital, effective January 1, 1964, his appointment was subject to the terms of the contract between Barnes Hospital and Washington University dated November 17, 1949, and just as in the subsequent contract between the two institutions, it was agreed that the medical staff of the hospital would consist solely of the teaching corps of the medical school of Washington University. Those who were nominated for membership on the medical staff subject to approval by the Trustees had to be recommended by the joint Medical Advisory Committee. Although it was the practice to accept nominations for appointment, the Trustees still reserved the right to accept or reject those nominated, and the final act in placing the nominee on the staff was to be done by the Trustees. Such appointments were on an annual basis. In addition, as a prerequisite to appointment or retention of staff membership at Barnes Hospital, it was necessary that plaintiff be appointed to the faculty of Washington University School of Medicine. This too was on an annual basis.

■■ Agency is not presumed and the burden of establishing it is always on the party alleging it to exist. Holt v. Queen City Loan & Investment, Inc., 377 S.W.2d 393, 399 (Mo.1964). " 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' Restatement, Agency, § 1." Leidy v. Taliaferro, 260 S.W.2d 504, 505 (Mo.1953); Pashalian v. Big-4 Chevrolet Company, 348 S.W.2d 628, 632 (Mo. App.1961). The implication of agency from the facts must follow from a natural and reasonable, and not a strained or distorted construction of these facts. Pashalian v. Big-4 Chevrolet Company, *supra* at 632.

■■ There is no evidence in the record to prove either directly or indirectly that the Trustees of the Hospital had given or undertaken to exercise any control over Dr. Moyer in entering into the alleged agreement, or over Dr. Ballinger in failing to reappoint Dr. Dillard to the faculty of the medical school. The trial court found that the "pertinent part" of the contract whereby Dr. Moyer agreed that the Trustees would appoint plaintiff to the medical staff at Barnes and plaintiff would engage in the private practice of medicine was ratified and confirmed by the Trustees in appointing Dr. Dillard to the hospital surgical staff in 1964 and in keeping him on the surgical staff through 1967. But this finding is without any support in the evidence. There is no evidence to show that the Trustees knew of this agreement, and even if they did know, continual reappointment would not constitute ratification. There is no evidence in the record that anyone in authority at Barnes Hospital had knowledge of any contract or promise by Dr. Moyer other than the Hospital Administrator who had no authority with respect to appointments or dismissals from the medical staff and who, although on the joint medical advisory committee, never took part in that committee's deliberations with respect to staff appointments.

Neither was there any evidence to indicate that Dr. Ballinger acted as agent for

the Trustees of the Hospital when he refused to recommend plaintiff's reappointment to the faculty of the medical school. This was not a direct dismissal by the Trustees as a result of some act or omission on the part of plaintiff as a disciplinary measure, but rather a result of the failure of the University to reappoint Dr. Dillard to its faculty and the consequent omission of Dr. Dillard's name from the list of those recommended for appointment as members of the staff of the Hospital. This action on the part of Dr. Ballinger and the University was at first challenged by Dr. Dillard and at his request he was to receive a hearing in this matter by the officials of the University. But upon his own attorney's request the scheduled hearing was dropped and nothing further in this area was pursued by plaintiff either with the University or the Hospital.

■ Plaintiff further urges that the defendants are responsible for his termination because Barnes consented that Dr. Ballinger be a dual agent of both Barnes and the University. There is no question that when Ballinger was appointed head of the surgery department at Washington University, he was also appointed surgeon-in-chief at the Hospital. But it was in his capacity as head of the surgical department at the University that he recommended that Dr. Dillard not be reappointed to the faculty. Dr. Ballinger had separate appointments from two principals with different duties and authorities under each appointment. As head of the department of surgery of the medical school, one of his duties was to make recommendations for appointment and reappointment to the medical school faculty. As surgeon-in-chief of the Barnes medical staff, he was required to present to the joint medical advisory committee all recommendations for appointments and reappointments to the surgical staff. In order for there to be a dual agency, dual principals must have joint control over the agent. However, here Barnes had no control over the actions of Dr. Ballinger as head of the department of surgery of the medical school, and the University had no control over his actions as chief of surgery.

■ Although principals may be bound by the acts and representations of a common agent, it must appear that authority was given by all the principals. If the authority to act be separate, then the power must be executed separately and cannot be executed so as to bind the principals jointly. 2A C.J.S. Agency § 245, p. 953; 3 Am. Jur.2d, Agency § 197, p. 579; 1 Meacham, The Law of Agency § 184, p. 132.

Plaintiff further urges a joint responsibility for the act of Dr. Ballinger on the theory that both Barnes and the University were engaged in a joint venture. Counsel enumerates the various aspects of the relationship between the two institutions whereby the University provided the medical staff and the Hospital undertook the administration and management of not only its own hospitals but also those owned by the University on a consolidated basis, with the net earnings and losses to be divided equally. To support their contention of non-agency, the defendants assert that this relationship is more that of the nature of independent contractors.

■ The elements generally held to constitute a joint venture are: "[t]here must be an agreement, express or implied, among its members, a community of interest in the accomplishment of a common purpose, and a mutual right of control or to a voice in the direction of the enterprise." Hamilton v. Slover, 440 S.W.2d 947, 952 [1] (Mo.1969). Here, although facilities are to be shared for mutual benefit, no portion of the agreement between the two institutions gives either the right to control any of the operations of the other. Thus an important and necessary element, the right to control, was not present. The direction and management of the Hospital and the direction and the management

of the University were completely separate. Separate ownership of the properties and separate control were carefully preserved under the terms of the agreement.

 Even if we were to conclude that Washington University was in a joint venture with Barnes Hospital, the failure of the Hospital to reappoint plaintiff to its staff would not in itself be actionable. If Barnes is to be considered a private hospital, which it would seem to be, the law is clear that the exclusion of a physician or surgeon from practicing in such a hospital is a matter which rests in the discretion of the managing authorities. Cowan v. Gibson, 392 S.W.2d 307, 308 [1] (Mo.1965). If, because of public funding and government regulation, we were to conclude that the Hospital had such a public nature that plaintiff had standing to invoke the protection of the Fourteenth Amendment against deprivation of property without due process, then, without going into a discussion of cases in this area (most of which involve public hospitals maintained by a state or political subdivision), we conclude that plaintiff was afforded due process. Within the framework of the affiliation agreement, which we have already determined to be valid, the discretionary basis of plaintiff's appointment to faculty status and thence to the Hospital staff was to be exercised by the University. After the exercise of this discretion by the University plaintiff had ample notice and an opportunity for review of the discretionary action by the officials of the University. As previously described in the factual account of this case, he did take opportunity to request a hearing and review of the administrative action of the University. While the provost of the University was in the process of appointing a panel to hear his complaint, on July 14, 1969 his attorney wrote the Dean of the University School of Medicine that since the school was unwilling to agree that his complaint be heard by members of certain groups outside of the medical school as requested, that it would serve no useful purpose to have a hearing. Since he declined the hearing on his claim, he waived whatever claim he had as to failure to accord him due process. DeMay v. Liberty Foundry Co., 327 Mo. 495, 37 S.W.2d 640, 646 [5] (1931); 16 Am.Jur.2d, Const.Law, § 131, p. 328.

 Dr. Dillard was fully cognizant of the relationship of the University School of Medicine with Barnes Hospital. He knew that members of the staff were required by the by-laws of the Hospital to hold appointments on the faculty of the University School of Medicine. He further knew that when a member of the medical staff ceased to be a member of the faculty, his appointment to the medical staff terminated without any action by the Trustees. In a written document admitted as one of plaintiff's exhibits, he admitted having read these by-laws, and on March 4, 1966 over his signature agreed to abide by them. There could be no question as to his knowledge of this requirement.

Many other contentions have been raised by defendants in this appeal. Those heretofore discussed are dispositive of the case and further discussion would merely lengthen this opinion.

The judgment as to both Counts I and II is reversed.

DOWD, Chief Judge, and CLEMENS and RENDLEN, JJ., concur.