James O. MITCHELL, et ux., Respondent,

v.

**K.C. STADIUM CONCESSIONS, INC., et al., W.R. Grace & Company, Defendants,**

**Home Insurance Company of Illinois, Appellant,**

**Restaurant Enterprises Group, Inc., et al., Appellants.**

James O. MITCHELL, et ux., Respondent,

v.

**RESTAURANT ENTERPRISES GROUP, INC., et al., Appellants.**

**WD 46809, WD 46825.**

Missouri Court of Appeals, Western District.

Sept. 28, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 2, 1993.

Application to Transfer Denied Dec. 21, 1993.

Kenneth O. Smith, Martin Mark Meyers, Kansas City, for appellants.

George Kapke, Independence, for respondent.

Martin Mark Meyers, Kansas City, for defendants.

Before BERREY, P.J., and BRECKENRIDGE and HANNA, JJ.

HANNA, Judge.

This action for damages arises from the destruction by fire of a building owned by the plaintiffs, Mr. and Mrs. James O. Mitchell. The lawsuit was filed against the Restaurant Enterprises Group, Inc., (REG) and Home Insurance Company of Illinois (Home Ins.). Both REG and Home Ins. appeal from the order of the trial court which entered judgment on the jury's verdict in favor of the Mitchells. The trial court overruled both defendants' motions for judgment notwithstanding the verdict and alternative motions for new trial. REG appeals from a $270,-625.40 judgment in favor of the Mitchells for failure to provide rent insurance. Home Ins. appeals the judgment in favor of the Mitchells on the insurance policy for destruction of the building in the amount of $870,000.

On December 13, 1973, Marguerite S. Lamble entered into a lease with defendant K.C. Stadium Concessions, Inc. as lessee on the property located at 3706 S. Noland Road. The lease contained the following relevant provisions: 1) the duration of the lease was twenty years; 2) rent was $4,677.09 per month; 3) lessee agreed to maintain, at its own expense, fire and extended insurance coverage on the premises, insuring all building and improvements for their full replacement value; 4) lessee agreed to maintain insurance to cover the payment of rent to lessor during any period in which the premises was untenable; and 5) in the final five years of the lease, either party had the option of canceling in the event of the buildings destruction.

Subsequent to the signing of the lease, several events occurred. On September 16, 1974, the Mitchells acquired the property subject to the lease and effectively became the lessor. On March 23, 1983, K.C. Stadium

Concessions assigned the lease to Gilbert/Robinson. Through this transaction, Gilbert/Robinson became the lessee under the lease agreement. By a letter dated December 7, 1988, the Mitchells were notified by REG, Gilbert/Robinsons parent corporation, that due to corporate reorganization the subsidiary of Gilbert/Robinson was being sold but that prior to the sale, the 1973 Lease Agreement was being assigned to REG–GRC Corp., a wholly owned subsidiary of REG. The letter was on REG letterhead. The Mitchells were provided with a copy of the Assignment and Assumption Agreement which advised that REG–GRC Corp. was the entity which had responsibility for the Gilbert/Robinson lease, and acknowledged that Gilbert/Robinson would remain liable to the plaintiffs under the lease agreement.

By amendment to the lease, the parties had agreed that if the building was destroyed in the last five years of the term of the lease, then either party had the option not to rebuild and, in that event, the lease "shall be declared canceled and terminated as of the date of destruction." On March 27, 1989, the building on the leased premises was totally destroyed by fire. The trial court ruled, as a matter of law, that the destruction occurred in the last five years of the lease.

On April 13, 1989, both Gilbert/Robinson and REG–GRC Corp., through their attorneys, notified the Mitchells that they were exercising their option under the lease not to rebuild and to declare the lease terminated as of the date of the fire, March 27, 1989. The Mitchells have not rebuilt the structure since the fire.

Count III of the Mitchells petition, which is the only count making claim against REG, alleged that REG breached the lease by 1) its failure to insure the full replacement value of the leased premises and to name the Mitchells as additional insureds on the policy; 2) its failure to pay rent from April 1, 1989, in the sum of $4,677.09 per month; 3) its failure to pay the taxes for the year 1989 in the amount of two thousand, five hundred eighty-eight and 50/100 ($2,588.50) dollars.

The Mitchells also sued Home Ins. for "breach of contract under a third-party beneficiary theory." The Mitchells alleged that

REG purchased insurance on the leased premises from Home Ins. and, as third-party beneficiaries of the insurance policy, they are entitled to the policy limits of the insurance policy or full damages of $1,499,204.67, plus monthly rent, real estate taxes and costs.

On June 25, 1992, after a jury trial, judgment was entered in favor of the Mitchells and against REG for the failure of REG to provide rent insurance, a cause of action that was not pleaded until immediately before submission of the case to the jury. Damages were assessed at $270,625.40 for the plaintiffs claim that REG failed to provide rent insurance. Judgment was also entered against Home Ins. and damages assessed at $870,000 for loss of the building. Both defendants appeal. We reverse the award against REG and affirm the judgment against Home Ins.

## REGs Appeal

■ In REGs first point, it claims that the trial court erred in overruling its motion for judgment notwithstanding the verdict because there was no substantial evidence that defendant REG was a party to the lease, that it assumed any liability under the lease, or that it did business as or was the alter ego of REG–GRC Corp. so as to justify piercing the corporate veil. The Mitchells theory is that REG assumed the liabilities of the lease and, in that respect, on the morning of trial, moved the court to amend its caption of the petition by interlineation to have it read: "REG also known as, or doing business as, REG–GRC Corp." Nothing else in the pleading was amended.

The plaintiffs theory was that REG and REG–GRC Corp. were a single corporate entity. However, plaintiffs introduced proof which established that REG–GRC Corp. was a separate corporation and, on appeal, it has not been disputed that REG–GRC Corp. is a wholly owned but separate corporation of REG. Additionally, the plaintiffs concede that they did not attempt to offer the necessary proof to pierce the corporate veil, and, in fact, argue that their recovery against REG does not require them to pierce the corporate veil of REG. Plaintiffs maintain that REG is liable because it voluntarily as-

sumed the liability under the lease. The factual basis for this claim, plaintiffs argue, is that REG paid rent, paid taxes, and bought insurance on the building, thereby acting as the lessee.[1] REG argues that this is not sufficient evidence to establish that REG assumed liability under the lease to cause it to become one and the same entity as REG–GRC Corp. REG also argues that the Mitchells were advised from the outset that the party assuming liability for the lease was REG–GRC Corp., a separate corporation.

Plaintiffs apparently assert a new exception to the general rule of nonliability of a separate parent corporation for the contracts of its subsidiary corporation. However, it cites no cases in support of this theory of corporate liability.

■ As a general rule, two separate corporations are to be regarded as distinct legal entities, even if the stock of one is owned partly or wholly by the other. *Central Cooling & Supply Co. v. Director of Revenue*, 648 S.W.2d 546, 547–48 (Mo.1982); *Terre Du Lac Assn, Inc. v. Terre Du Lac, Inc.*, 737 S.W.2d 206, 218 (Mo.App.1987). Ordinarily, a parent corporation is not liable for the acts of its subsidiary corporation. An exception to this rule occurs in the situation where the plaintiff pierces the corporate veil.

■ The mere fact of complete ownership and control by the parent corporation does not, of itself, justify piercing of the corporate veil. *Terre du Lac*, 737 S.W.2d at 218. The test to determine when to pierce the veil and thereby hold the parent liable has two parts: first, the corporation must be controlled and influenced by persons or by another corporation; and second, the evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud. *Id.* (citing *Fairbanks v. Chambers*, 665 S.W.2d 33, 37 (Mo.App.1984)). The plaintiffs' evidence that REG made two rent and one tax payment and insured the building falls short of evidence necessary to prove REGs domination of REG–GRC Corp. or to hold REG liable under any other theo-

ry. Further, no evidence was presented that REG was acting with any improper purpose. The second prong of the test was also unsatisfied.

In *State ex rel. General Mills, Inc. v. Waltner*, 348 Mo. 852, 156 S.W.2d 664 (1941), the court found that a suit against a parent for the tort of its subsidiary requires different allegations and proof than a suit against the subsidiary for its own tort. *Id.* 156 S.W.2d at 668. "Therefore, a petition stating a cause of action against the subsidiary cannot, by amendment, be converted into a suit against the parent corporation." *Id.*

■ A second and decisive reason for denying relief to the plaintiffs under this point is that Article IX of the lease amendment, made at the time of the original lease, provides that if the building is destroyed by fire or other casualty within the last five years of the lease, either party may elect to terminate the lease. The building was completely destroyed by fire on March 27, 1989. The defendant exercised its option by written notification to the plaintiffs of its intention to terminate the lease. The trial court ruled at the close of the plaintiffs evidence that the lease term commenced on March 12, 1974. This ruling means that the fire on March 27, 1989, occurred within the last five years of the lease. Plaintiffs argue that this ruling was erroneous.

■ Absent an express provision in the lease agreement, there is no implied obligation on the part of the tenant to insure the demised premises. 51C C.J.S. Landlord & Tenant § 374 (1968). The lease here had a provision requiring that the tenant purchase lost rental insurance.

The lease agreement reads:

Lessee agrees to maintain, at its own expense, insurance to cover the payment of rent to lessor during any period hereunder in which the premises are untenantable and lessee is unable to conduct its normal business activities.

The cancellation provision of the lease reads as follows:

---

1. In fact, the evidence was that of the four rent payments made, two were made by REG and one

tax bill was paid by REG. Apparently, the 1989 tax bill was paid by the plaintiffs.

provided however, if such destruction occurs in the last five years of the term of this Lease then and in that event either party may elect not to rebuild and in (sic) event this lease shall be declared canceled and terminated as of the date of destruction.

If the premises were destroyed by fire or other casualty during the first fifteen years, lost rent payments would be a factor since there was no right to terminate the lease. The risk of the loss of rental payments was on the tenant who was required to purchase insurance to cover this risk. If the fire occurred during the final five years of the lease, either the premises would be rebuilt and rent payments due or the property would not be rebuilt and the lease term would end as of the date of destruction. In the event of termination, there would be no lost rental. The phrase, "during any period hereunder" in the lease must be read to mean while the lease agreement is in effect and the premises are untenantable. The cancellation provision of the lease could not be clearer. If the destruction occurs within the last five years of the lease and the tenant (or landlord) cancels, the lease is terminated as of the date of destruction. The defendants terminated the lease effective the date of the fire. At that point, there was no longer a lease and, therefore, no rent payments were due. *See, e.g., Royal Indemnity Co. v. Little Joe's Catfish Inn, Inc.,* 636 S.W.2d 530, 534–35 (Tex.Ct.App.1982).

The sole question of the correctness of the trial courts ruling depends on whether the lease commenced on March 12, 1974, or as plaintiffs contend, on the first day of the following month, April 1, 1974. If the term of the lease commenced on April 1, 1974, the fire did not occur in the last five years and the tenant did not have the option of declining to rebuild. The plaintiffs agree that if the lease commenced on March 12, 1989, then the fire did occur in the last five years and the tenant could elect not to rebuild and could terminate the lease.[2]

The premises were leased to the tenant for a period of twenty years immediately following the commencement of the term. There are two references in the lease concerning the commencement of the term. The first provision states that "[t]he said term shall commence when the Lessor shall provide and deliver to Lessee certification from a title insurance company authorized to insure titles in the State of Missouri showing title in the Lessor." Unfortunately, we are unable to locate any evidence that supports what that date is and the parties have not supplied us with such a date.

The commencement of the term is again mentioned in the same paragraph where the parties agree: "The parties shall . . . execute an appropriate instrument fixing the commencement date of the term of this lease." Plaintiffs Exhibit # 16 is a letter from the Mitchells real estate broker to the tenant, who at that time was Gilbert/Robinson. The plaintiffs expressly, and the defendant by inference, agree that this exhibit is the "appropriate instrument fixing the commencement date of the term of this lease." The broker for the plaintiffs stated that the "[t]he term of your lease commensced (sic) on March 12, 1974. . . ."

■ The plaintiffs argue that the commencement date, having been fixed by Exhibit # 16, refers back to the lease, which fixes the commencement date on the first day of the month next succeeding the opening of the leased premises for business. This argument is without merit. The plaintiffs fail to describe what provision in the exhibit or lease triggers the reference back to the lease. We are unable to discern any such requirement. More importantly, the reference to the first day of the next month describes the start of rent payments, not the commencement of the term of the lease. Also, the evidence does not supply the date on which the tenants opened for business. We accept the parties suggestion that the exhibit is the document that the parties con-

---

**2.** At the close of the plaintiffs' evidence, the trial court denied plaintiffs' pleaded claim that the defendant/tenant failed to pay rent. The basis of the ruling was that the court determined the fire occurred in the last five years of the lease and

the lease, therefore, was terminable at the tenant's option. The claim submitted to the jury was the tenant's failure to obtain lost rental insurance coverage.

tracted to create in order to fix the commencement date.

### Home Ins.'s Appeal

■ Home Ins. issued a policy of insurance to REG that provided coverage for over 800 different properties located in a number of states. The policy does not list the particular properties owned or leased by REG and, therefore, the plaintiffs are not listed on the policy. There is no dispute that Home Ins. covered the property in question. REG is a named insured and it never made a demand against Home Ins. under the policy. Home Ins. and the plaintiffs, following the fire, entered into discussions regarding the replacement cost of the building and improvements. The testimony was that Home Ins. offered plaintiffs $500,000 for replacement of the building and improvements, which was declined. The lawsuit followed. Home Ins. complains that 1) plaintiffs did not have a right to bring this lawsuit because they are neither named insureds nor third-party beneficiaries; 2) Home Ins. is entitled to judgment as a matter of law because it was relieved of its obligation to pay replacement value of the property; 3) there was a failure of substantial evidence to support the damage award; and 4) there were evidentiary, instructional and cumulative errors.

Home Ins. argues in its first point that the plaintiffs are not entitled to recover because they are neither named insureds nor third-party beneficiaries. It is conceded that the only named insured is REG and, therefore, the issue is whether plaintiffs are third-party beneficiaries to the insurance policy.

■ A third-party beneficiary is one who is not privy to a contract but to whom the law gives the right to maintain a cause of action for its breach. *Volume Servs., Inc. v. C.F. Murphy & Assocs., Inc.,* 656 S.W.2d 785, 794 (Mo.App.1983); *Laclede Inv. Corp. v. Kaiser,* 596 S.W.2d 36, 41 (Mo.App.1980). Only those third parties for whose primary benefit the contracting parties intended to make the contract may sue on the contract.

*Volume Servs.,* 656 S.W.2d at 794. The intent of the contracting parties is of paramount importance to such an analysis. *Laclede,* 596 S.W.2d at 41. REGs intent is not truly an issue since it agreed under the terms of the lease to make the plaintiffs named insured under the insurance policy. Our inquiry is limited to Home Ins.'s intent.

■ The party need not be named in the contract, but the terms of the contract must clearly express an intent to benefit either that party or an identifiable class of which plaintiff is a member. *Volume Servs.,* 656 S.W.2d at 794–95. We must look at the terms of the insurance policy to determine whether Home Ins. intended coverage of plaintiffs interest in the property. *Puritan Ins. Co. v. Yarber,* 723 S.W.2d 98, 102 (Mo. App.1987).

The insurance policy states that it covers:

A. Real and Personal Property

(1) The interest of the insured[3] in all real and personal property, including improvements and betterments, owned, used, or intended for use by the insured.

(2) The interest of the insured in the real and personal property of others in the insureds care, custody, or control, *and the insureds liability imposed by law or assumed by contract, for such property.* (emphasis added)

Later, in a section entitled "Valuation," the policy states that if the loss concerns the property of others, the policy is limited to the amount for which insured is liable. The contracting parties anticipated that some of the property being insured by REG would not be owned by REG or any of its subsidiaries. It follows that Home Ins. intended that coverage extend not only to the property which REG owned but also to property that REG leased. Furthermore, the policy specifically states that it covers the insureds liability imposed by law for leased property. This creates an identifiable class of landowners who are to directly benefit from the coverage if their property is damaged. *See Volume*

---

**3.** While REG actually purchased the policy, the term "insured" is defined to include REG and "all of its affiliated, subsidiary and associated companies and/or corporations owned by the above named company." In this case, REG–GRC Corp. is the insured with which we are concerned.

*Servs.*, 656 S.W.2d at 795 ("specific provisions in the contracts showing an assumption of responsibilities by the defendants for all damage to lessees or other classes of which plaintiff is a member, could adequately indicate intent."). The language of the policy itself is sufficient to demonstrate that both REG and Home Ins. intended that plaintiffs benefit from the terms of the policy. Therefore, plaintiffs are third-party beneficiaries and are entitled to maintain an action on the policy. Home Ins.s first point is denied.

■ Home Ins. next argues that since REG elected not to rebuild, Home Ins. was not obligated to pay on the policy because in the lease agreement between plaintiffs and REG, the parties contracted to rebuild. In other words, Home Ins. argues that since plaintiffs and REGs lease was to rebuild and the restaurant was never rebuilt because the lease was canceled, Home Ins. was relieved of any obligation to pay replacement costs.

Needless to say, Home Ins. cites no cases in this or any other jurisdiction supporting that proposition. The lease required the tenant to surrender the premises at the expiration of the lease in good order and condition and further required the lessee/tenant to carry fire and extended coverage insurance of the property for the full replacement value. An amendment directed the lessee to name the lessor as an additional insured under the insurance policy. Failing the return of the property in good condition, the benefits of the fire and extended coverage—"insuring all buildings and improvements thereon to their full replacement value"—required that the owner be compensated for the replacement value. The lease and the insurance policy impose upon the insurance company and REG the risk of loss to the building. Home Ins. is not relieved of its obligation to pay the replacement cost merely because the parties decided not to rebuild. Point denied.

■ Next, Home Ins. contends there was not substantial evidence to support the jury award of damages. This issue is repetitiously argued under three different points in Home Ins.s brief. We will attempt to cover each point but not necessarily in the order raised.

With respect to the evidentiary support of the damage award, Home Ins.s first complaint is directed toward plaintiffs expert, Mr. Bowden. Home Ins. contends that his testimony, particularly as it related to the interior finish calculations, the $40,500 estimate for structural steel and certain line items, was based on speculation and guesswork.

■ The qualifications and testimony of an expert witness lie within the discretion of the trial judge and that decision will not be interfered with unless there is a clear abuse of discretion. *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 208 (Mo. banc 1991). Mr. Bowden had over twenty years experience as a construction estimator and had estimated construction costs for competitive bids for various construction companies during that period of time. He testified that in order to develop an estimated cost for reconstruction of the building, he went to the scene of the loss to inspect the loss, made drawings, and viewed architectural structural drawings and plans which had been admitted into evidence.

There were certain costs which the witness could not estimate with exactness until full architectural and engineering drawings and plans were prepared. He testified on direct examination that his estimate was hampered because the documents he used were not a complete representation of the building before the fire. This lack of information resulted in the expert's imprecise testimony concerning certain aspects of the replacement costs. As an example, Home Ins. complains the expert did not know what type of roof was on the building at the time of the fire. He, therefore, based his estimate on a standard four-ply built twenty-year bondable roof. A number of other assumptions had to be made, but this is not unusual in the business of estimating construction projects.

■ With respect to the structural steel estimate, Home Ins. complains that Mr. Bowden disregarded the documents depicting the structural steel. Instead he used a square footage and an average cost per square foot. He admitted that he had the option of estimating an actual weight but decided it would take much less time to do a square footage

estimate. Home Ins.'s argument appears to be that his estimate lacked any factual basis, but there is no showing of such a deficiency. The defendant does not suggest in what manner the witness's method of estimation was unacceptable or would result in speculation. The fact that this method took less time to arrive at an estimate goes to the weight of the evidence and is for the fact finder to consider.

 Home Ins. is critical of Mr. Bowdens testimony concerning the interior finishing work. In calculating the interior finish work, the witness used a $30 per square foot figure, which he considered to be a mid-range restaurant interior at the time of the fire. The $30 per square foot cost was arrived at from his experience and knowledge of interior finish jobs. Defendant focuses on Home Ins. attorneys cross-examination of Mr. Bowden when he was asked whether "a lot of the interior finish calculations were purely speculation," and answered yes. The witness, however, later recanted this testimony when he said that "pure speculation" was an overbroad statement. This cross-examination, in light of Mr. Bowden's lengthy testimony concerning many aspects of the replacement costs of the building, did not render the expert's opinion so uncertain that it could not support the estimate of damages. The witness's opinion regarding the cost of replacement of the building survived the cross-examination when it is construed as a whole. Any weakness in the testimony was for the jury to evaluate. *Atkinson v. Be–Mac Transport, Inc.*, 595 S.W.2d 26, 31 (Mo.App. 1980). It went to the weight and credibility of that testimony. *Farmers & Merchants Ins. Co. v. Harris*, 814 S.W.2d 332, 334 (Mo. App.1991).

 Home Ins. maintains that plaintiffs damage testimony, over objection, addressed trade fixtures.[4] In this case the plaintiffs/owners contended they owned the trade fixtures but the trial court ruled otherwise. Trade fixtures, even those attached to the building, unless the parties provide otherwise, are generally considered to be re-

tained by the tenant. *Willett v. Centerre Bank of Branson*, 792 S.W.2d 916, 919 (Mo. App.1990). Home Ins. identifies trade fixtures that should not have been a part of the damages as interior finishes (without further detail), fire protection systems, heating, ventilating and air conditioning system, and the electrical and lighting systems. Trade fixtures have been defined as:

> articles or appliances which are in some manner or to some degree annexed to or connected with the realty by the tenant *for the purpose of carrying on the particular trade or business* for which the premises were demised to him by the landlord, but which, notwithstanding their annexation or connection, do not become a part of the realty, remaining instead the property or chattels of the tenant, removable by him before the expiration of the term of his lease or the period thereafter during which he holds the premises with the landlords consent. *Matz v. Miami Club Restaurant*, 127 S.W.2d 738, 741 (Mo.App.1939) (emphasis added).

In *Matz*, the trade fixtures were booths, drop lights, ice boxes, a soda fountain, a back bar, a pastry bench and a hot water table. *Id.* In *Endler v. State Bank & Trust Co. of Wellston*, 352 Mo. 961, 180 S.W.2d 596, 599 (1944), trade fixtures consisted of the banks vault doors and a night depository. Under the circumstances, the items that Home Ins. claims were trade fixtures did not fit such a category. They were not articles or appliances annexed for the purpose of carrying on the particular trade, i.e., the restaurant business. They were, in fact, items that are necessary for a structure built to comply with city building codes. Point denied.

Home Ins. complains that there was no evidence as to what "improvements" were in the building at the time of the fire. This statement may be correct but, standing alone, as it does in defendants' brief, it has no legal significance. Home Ins. does not advise us what "improvements" Mr. Bowden testified about which should have been excluded. Therefore, we are not able to deter-

---

**4.** There is a dispute between the parties as to whether "trade fixtures" were a part of the estimator's final calculations. There was evidence that the costs of the trade fixtures were separated out after the court's ruling.

mine, without considerable guesswork on our part, the specific improvements about which Home Ins. complains. We decline to engage in such speculation. Point denied.

■ The trial court is also charged with error by excluding the testimony of Mr. O'Leary regarding the suitability of the building for uses other than a restaurant and the testimony of Mr. Seligson concerning the cost to replace a "tenant-ready" building. Defendant argued that the plaintiffs were only entitled to a tenant-ready building as opposed to a restaurant-ready building. A tenant-ready building is described as a general purpose building.

Mr. O'Leary was not Home Ins.'s witness. His testimony was offered by REG and was made in the nature of an offer of proof. Neither defendant made a request to include the testimony and, therefore, no ruling was made by the court. His testimony primarily addressed his dealings with several prospective tenants concerning potential leases on the premises. Home Ins. does not point to what competent evidence was excluded and what material issue of fact the evidence would address.

It is not clear from a reading of the transcript exactly what a tenant-ready structure is. Apparently, it is a "general purpose" building. Certainly Home Ins. would not include in that category a car wash, warehouse, movie theater, or other unlike structure. Without greater specificity, which was not offered, the trial court did not abuse its discretion by excluding this evidence. *Ryan v. Parker*, 812 S.W.2d 190, 195 (Mo.App. 1991). Point denied.

■ Next, Home Ins. argues that the trial court erred because the word "improvement" appeared in the verdict directing and the damage instructions but was not defined. The trial court should define for the jury legal or technical terms occurring in the instructions. *Yamnitz v. Polytech, Inc.*, 586 S.W.2d 76, 81 (Mo.App.1979). However, a word which has a common usage and is generally understood does not need definition. *Huff v. Union Elec. Co.*, 598 S.W.2d 503, 510 (Mo.App.1980). In *Huff*, there was a request to define "improvements." The court determined it was a word the average juror would understand. *Id.* Point denied.

Home Ins. claims further error in several points, but these are simply repetitious complaints concerning the use of the word "improvements" in the damage instruction, lack of evidence as to what improvements were in the building at the time of the fire and undue speculation in the proof of damages. We have previously discussed these matters and the points have been ruled against the defendant.

Home Ins.'s final point of error is that the cumulative prejudicial effect of all of the errors warrants a new trial. Because the defendants' objections have been found to be without merit, no cumulative error has occurred.

The judgment of the trial court in favor of the plaintiffs and against the defendant REG, also known as or doing business as REG–GRC Corp., is reversed and the judgment against the defendant Home Ins. is affirmed.

All concur.