MID–MISSOURI TELEPHONE,
COMPANY, et al.,
Respondents,

v.

ALMA TELEPHONE COMPANY,
et al., Appellants.

No. WD 57367.

Missouri Court of Appeals,
Western District.

May 30, 2000.

Bruce Brown Waugh, Kansas City, for appellants.

Mark Thomas Kempton, Sedalia, for respondents.

Before Presiding Judge LAURA DENVIR STITH, Judge ROBERT G. ULRICH and Judge JAMES M. SMART, Jr.

LAURA DENVIR STITH, Presiding Judge.

This appeal involves the question whether Plaintiffs–Respondents—Mid–Missouri Telephone Company ("Mid–Mo Telephone"), its wholly-owned subsidary Mid–Missouri Cellular, Inc. ("Mid–Mo Cellular"), and the Jones Family, as the sole shareholders in Mid–Mo Telephone—were obligated by certain agreements they allegedly signed to offer Defendants–Appellants, who are three independent telephone companies and their three wholly-owned cellular telephone subsidiaries, a "right of first refusal" to buy the 25% partnership interest held by Mid–Mo Cellular in a limited partnership created by the four cellular telephone subsidiaries. The three independent telephone companies and their subsidiaries alleged that an offer of this right of first refusal was triggered by the fact that the Joneses planned to sell their 100% interest in Mid–Mo Telephone (the parent) to a third party, CEA Capital Partners USA, LP ("CEA").

Because we find that nothing in either of the contracts relied on by Defendants–Appellants required the Joneses to give those companies a right of first refusal before the Joneses sold their shares in Mid–Mo Telephone to CEA, we affirm the trial court's grant of summary judgment to Plaintiffs–Respondents in this declaratory judgment action.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1989, Plaintiff–Respondent Mid–Mo Telephone was an independent, privately held, Missouri corporation which provided local telephone service to certain counties in Missouri. At that time, the Federal Communications Commission ("FCC") was preparing to grant cellular telephone rights along Interstate 70 (I–70) east of Kansas City. Mid–Mo Telephone decided to bid on these rights, as did three other independent, privately owned telephone companies who are now Defendants–Appellants herein—Alma Telephone Company, Inc. ("Alma"), Citizens Telephone Company of Higginsville ("Citizens") and Chariton Valley Telephone Company ("Chariton") (sometimes collectively referred to herein as "the independent telephone companies"). These four companies were among the eligible candidates vying to acquire these cellular rights. Also among the eligible candidates were four larger telephone companies that operated in Missouri but which were subsidiaries of publicly traded corporations (the "publicly traded companies").

It was FCC practice that, unless all eligible candidates for obtaining cellular rights agreed to share those rights, the FCC would conduct a lottery to determine which eligible candidate would receive these cellular rights. Mid–Missouri invited the other three independent companies (Alma, Citizens and Chariton), as well as the four publicly traded companies, to agree that should any one of eight of them be selected in the lottery, they would all share and own the rights together. It prepared a document it entitled "Settlement Agreement" which it provided to the other seven companies, and which contained the terms on which it proposed the eight companies bid for the cellular rights. The Settlement Agreement provided that the signatories to it agreed that, if one of them won the lottery, they would thereafter enter into a Limited Partnership Agreement for the purpose of providing cellular service within the allotted area. In addition, Section J of the Settlement Agreement contained a right of refusal clause which stated in relevant part that:

No Partner may sell, transfer, assign or exchange any part of its Partnership

Interest to a non-affiliate of the Partner without first giving all of the other Partners the opportunity to acquire that interest for the value at which and under terms which any such non-affiliate has offered the selling Partner pursuant to a bona-fide offer in writing to pay for such interest. . . .

For purposes of this Section J, an assignment shall be deemed to have occurred if in a single transaction or in a series of transactions any interest in a Partner (whether stock, partnership, interest or otherwise) is transferred, diluted, reduced or otherwise affected. An assignment shall not be deemed to have occurred (i) due to the transfer of any or all of the outstanding capital stock of any corporate entity holding an ownership interest in a Partner, or (ii) due to the mortgage of all or any part of a Partnership Interest to a bank or trust company licensed pursuant to any state or federal banking laws.

On June 7, 1989, Mid–Mo Telephone, Alma, Chariton, and Citizens executed the Settlement Agreement, but the four publicly traded companies decided not to join. None of the four independent companies which signed the Settlement Agreement were, at that point, owned by a corporate holding company, nor did any of them own a cellular subsidiary.

One of the four signatories to the Settlement Agreement, Chariton, did win the lottery. None of the four went on to sign a Limited Partnership Agreement, as contemplated by the Settlement Agreement, however. Rather, for business reasons, the four telephone companies decided that it would be better for each of them to create wholly owned cellular subsidiaries. Accordingly, they created Chariton Valley RSA # 1 Corp ("Chariton Cellular"), Mid–Missouri Cellular, Inc. ("Mid–Mo Cellular"), Alma Cellular Telephone Company, Inc. ("Alma Cellular"), and Citizens Service Center, Inc. ("Citizens Cellular"). Chariton obtained permission from the FCC to transfer its rights to its wholly owned subsidiary and, in September 1989, the four cellular subsidiaries executed a Limited Partnership Agreement with each other. Chariton Cellular, Alma Cellular and Citizens Cellular each became 25% limited partners, and Mid–Mo Cellular became a 24% limited partner and a 1% general partner.

The Limited Partnership Agreement contained a right of first refusal clause similar to that in the Settlement Agreement, with one major exception. It did not include a provision like the provision in the Settlement Agreement which had stated that "An assignment shall not be deemed to have occurred (i) due to the transfer of any or all of the outstanding capital stock of any corporate entity holding an ownership interest in a Partner." It did contain the other provisions set out in the Settlement Agreement regarding transfer of partnership interests.[1] In ad-

---

1. In this regard, it provided:

   Any Limited Partner may transfer its Partnership Interest to an Affiliate thereof at any time without any consent or restriction from the General Partner or any other Limited Partner. Otherwise, there shall be no sale, transfer, assignment or exchange of the whole or any portion of any Limited Partner's Interest without the prior written consent of the General Partner, which consent shall not be unreasonably withheld. In addition, before any Limited Partner sells, transfers, assigns or exchanges any part of its Partnership Interest to a non-Affiliate of such Limited Partner, it shall offer, by giving written notice to the General Partner, that interest to all of the other Partners for the value at which and the terms under which such non-Affiliate has offered pursuant to a bona-fide offer in writing to pay for such interest. . . .

   For purposes of this Article XII, an assignment shall be deemed to have occurred if in a single transaction or in a series of transactions any interest in a Limited Partner (whether stock, partnership, interest or otherwise) is transferred, diluted, reduced or otherwise affected. An assignment shall not be deemed to have occurred due to the mortgage of all or any part of a Partnership Interest to a bank or trust company li-

dition, the Limited Partnership Agreement contained a "merger clause" which provided that:

> This Agreement constitutes the entire Limited Partnership Agreement between the Partners and their affiliates and (a) shall supercede all previous negotiations, commitments, representations and writings, and (b) to the extent inconsistent with any provision contained in any other documents, shall supercede such provisions.

In 1995, Citizens decided to create a holding company, Citizens Communication Corporation, to hold the stock of both Citizens Telephone and Citizens Cellular. It advised the other telephone companies of its plan and said that out of an abundance of caution it wanted to get their consent, and the other companies, including the Joneses' company, Mid–Mo Telephone, consented to the creation of the holding company.

In the latter part of 1998, Mr. David Jones informed the other telephone and cellular companies that his family planned to sell its stock in Mid–Mo Telephone, which was the parent of Mid–Mo Cellular, to CEA. On November 23, 1998, the other companies stated in a letter to Mr. Jones that they believed that his family's proposed sale of its stock in the parent would trigger their right of first refusal to buy Mid–Mo Cellular's interest in the limited partnership which owned the cellular rights at issue here.

On November 30, 1998, the Jones family filed a Petition for Declaratory Judgment in the Circuit Court of Lafayette County, Missouri, to decide this issue. Mid–Mo Cellular and Mid–Mo Telephone were also made Plaintiffs, and the three other telephone companies and their three cellular subsidiaries were made defendants. On April 2, 1999, the Joneses, Mid–Mo Telephone and Mid–Mo Cellular filed a Motion for Summary Judgment. The trial court granted the motion for summary judgment, holding that the Settlement Agreement was superceded by the Limited Part-

nership Agreement and the latter did not require the Joneses or Mid–Mo Telephone to offer the other companies a right of first refusal. This appeal followed.

## II. STANDARD OF REVIEW

When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered. Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. We accord the non-movant the benefit of all reasonable inferences from the record.

Our review is essentially de novo. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993) (citations omitted). We will uphold the trial court's grant of summary judgment where: (1) there is no genuine dispute of material fact, and (2) the movant is entitled to judgment as a matter of law. *Id.* at 377.

## III. LEGAL ANALYSIS

■ The independent telephone companies and other cellular subsidiaries argue that the determinative fact on this appeal is that it was the intent of the four independent telephone companies, as shown by the Settlement Agreement, to give each other a right of first refusal so as to protect themselves from the possibility that any one of their interests in the cellular

censed pursuant to any state or federal     banking laws.

telephone rights at issue could fall into the hands of an outsider. Assuming that this was what motivated the parties to enter into the Settlement Agreement, however, if that is not what that agreement or the Limited Partnership Agreement said, then we are powerless to rewrite their contract for them so that it includes provisions that they wish they had put in it at the time of signing, but did not in fact include. And, here, we find that neither agreement gives the independent companies a right of first refusal in this situation.

The problem at the heart of the independent companies' arguments is that, while the *parent companies* – Alma Telephone, Chariton Telephone, Citizens and Mid–Mo Telephone –signed the Settlement Agreement, and while that agreement explicitly states that these four companies will enter into a Limited Partnership Agreement with a right of first refusal clause if one of them wins the lottery for the cellular rights, the four parent companies never actually entered into the Limited Partnership Agreement. Instead, as noted earlier, once Chariton won the cellular rights, each of the four telephone companies created a subsidiary and it was their *subsidiaries* that signed the Limited Partnership Agreement, not the parents. Neither did the parent companies sign the Limited Partnership Agreement as guarantors or otherwise agree to be bound by it. Thus, while the parent corporations owned 100% of each of their respective subsidiaries, none of them owned a direct interest in the limited partnership ultimately created by their subsidiaries.

■ This distinction in ownership is dispositive, for "[a]s a general rule, two separate corporations are to be regarded as distinct legal entities, *even if the stock of one is owned partly or wholly by the other.*" *Mitchell v. K.C. Stadium Concessions, Inc.*, 865 S.W.2d 779, 784 (Mo.App. W.D.1993). Thus, the "[o]wnership of capital stock in one corporation by another does not itself create identity of corporate interest as between the two." *Central Cooling & Supply Co. v. Director of Reve-*

*nue, State of Missouri*, 648 S.W.2d 546, 548 (Mo.1982) (finding that transactions between a parent corporation and its subsidiary do incur sales tax). Indeed, our Supreme Court has advised that the doctrine of corporate entity is valid and substantive in nature, and should "be ignored with caution, and only when the circumstances clearly justify it." *Id.*

■ For this reason, "[n]ormally a parent corporation is not responsible for the acts of its subsidiary corporation." *Grease Monkey Intern., Inc. v. Godat*, 916 S.W.2d 257, 262 (Mo.App. E.D.1995). *See also Central Cooling & Supply Co.*, 648 S.W.2d at 548; *Mitchell*, 865 S.W.2d at 784. Of course, where circumstances exist that would allow the wronged party to pierce the corporate veil, a parent corporation could then incur liability, thus losing the parent/subsidiary distinction. *Id.* Such circumstances are present "only where there is such dominion and control that the controlled corporation had no separate mind, will or existence of its own and is but an alter ego for its principal." *Grease Monkey Intern., Inc.*, 916 S.W.2d at 262. Similarly, absent such control, there can be no principle-agent relationship between corporate entities. *Hefner v. Dausmann*, 996 S.W.2d 660, 664 (Mo.App. S.D.1999).

■ Here, there were no allegations that this level of control was exerted by the parent over their subsidiaries. The subsidiaries neither acted as agents on behalf of their parents, nor destroyed the distinction between these corporations. We are thus left with what is, in effect, a request to hold the parent companies liable based on a Limited Partnership Agreement that they did not sign, and for which they cannot be held responsible under agency theory or under principles governing piercing of the corporate veil. This we cannot do.

The independent companies argue that, if we find that the parent telephone companies are not bound by the Limited Part-

nership Agreement, then we must find that the trial court erred in holding that the Limited Partnership Agreement superceded the Settlement Agreement; for it could not have done so since there was no identity of the parties. Thus, the merger clause contained in the Limited Partnership Agreement, stating that it superceded all prior agreements of the parties, had no effect on the rights and obligations of the parent companies, since they did not sign the Limited Partnership Agreement and thus could not be bound by its merger clause.

While we agree with the independent companies that the Limited Partnership Agreement could not supercede the Settlement Agreement where, as here, the parties to each agreement were different, we do not believe this aids the independent companies' position. In the Settlement Agreement the four independent companies agreed that they would create a partnership to own the cellular rights, would sign a Limited Partnership Agreement governing that partnership, and would not transfer their partnership interest in the yet-to-be-created limited partnership without the consent of the other partners, unless one of two exceptions applied. However, the telephone companies that signed the Settlement Agreement never became partners with each other, and never otherwise formed a partnership. Instead, as noted, once the cellular rights were obtained, they decided to create subsidiaries and it was those subsidiaries that formed a partnership. Since the telephone companies never formed a partnership, a condition precedent to the right of first refusal to purchase each others' interests in that contemplated partnership never occurred, for if there was no partnership of the parents, then there was no partnership interest to which the right of first refusal could apply.

That their subsidiaries did in fact set up such a limited partnership, pursuant to terms similar to those contemplated by their parents, is of no legal consequence here. By choosing to create subsidiaries as separate legal entities, with all the ben-

efits and burdens of such a business decision, and allowing only the subsidiaries to enter into the partnership, the parent companies changed the assumptions on which the Settlement Agreement was written. While, had they thought further about it, they might have better effectuated their intent by having the parents also sign the Limited Partnership Agreement or otherwise agree to be bound by its terms, they did not do so. They cannot now attempt to ignore the distinction between parent and subsidiary in an effort to either acquire a right of first refusal that as to them never came into being or assume a similar right by virtue of their ownership of their respective subsidiaries.

■ Finally, we note that, even were there a basis for holding that the Settlement Agreement bound the parent companies to offer each other a right of first refusal as to their interests in the partnership (despite the fact that the partnership then contemplated was never formed), we would be required to hold that an exception to that right of first refusal applied here. As quoted earlier, the right of first refusal in the Settlement Agreement was subject to two exceptions, the first of which Mr. Jones argues is applicable to his sale of his family's interest in Mid–Mo Telephone. That exception states in relevant part:

> For purposes of this Section J, an assignment shall be deemed to have occurred if in a single transaction or in a series of transactions any interest in a Partner (whether stock, partnership, interest or otherwise) is transferred, diluted, reduced or otherwise affected. *An assignment shall not be deemed to have occurred (i) due to the transfer of any or all of the outstanding capital stock of any corporate entity holding an ownership interest in a Partner* . . .

(emphasis added).

The independent companies claim that this exception was intended only to apply to publicly traded companies, and not to

privately held companies such as Mid–Missouri Telephone Company. However, nothing in the Settlement Agreement limits this clause in this way. While the independent companies may have included the clause in the Agreement because of their desire to attract the four publicly held companies they wanted to join their agreement, the provision as written was not so limited. By its terms, it applies to any company with outstanding capital stock – that is, stock held by someone other than the company. Here, the Jones family holds the outstanding capital stock of Mid–Missouri Telephone Company, and seeks to sell that stock. Mid–Missouri Telephone Company is a corporate entity. Mid–Missouri Telephone Company owns 100 percent of the stock of Mid–Missouri Cellular, Inc. Mid–Missouri Cellular, Inc. is a partner in the Limited Partnership which the subsidiaries ultimately created. Thus, Mr. Jones seeks to transfer the outstanding capital stock of a corporate entity—Mid-Missouri Telephone Company – and that corporate entity holds an ownership interest in a partner—Mid-Missouri Cellular, Inc. The exception clearly applies. The Defendant–Appellant independent telephone and cellular companies have no right of first refusal as to the sale.

For the reasons stated above, the judgment is affirmed.

Judge ROBERT G. ULRICH and Judge JAMES M. SMART, Jr., concur.