**Gladys ROTH, Appellant,**

v.

**Jan ZUKOWSKI, et al., Respondents.**

**Jan ZUKOWSKI, et al., Appellants,**

v.

**Gladys ROTH, Respondent.**

**No. 70125.**

Supreme Court of Missouri,
En Banc.

Sept. 13, 1988.

Rehearing Denied Oct. 18, 1988.

William Jay Powell, John L. Roark, Columbia, for appellant.

Craig S. Johnson, Jefferson City, for respondents.

RENDLEN, Judge.

The parties appeal from judgments entered upon jury verdicts for plaintiffs Jan and Theresa Zukowski of $150,000 and $20,000 respectively as compensation for damages sustained when Jan received an electrical shock while performing as a musician at The Brief Encounter, a nightclub operated by defendant's lessee on property owned by defendant. Plaintiffs, arguing for increased damages, challenge the trial court's method of calculating the judgment, while defendant, seeking reversal, contends that plaintiffs failed to make a submissible case. We granted transfer to consider the applicability of the "public use" exception to the general rule of nonliability of a landlord for injuries to a tenant's invitees. Having concluded that the circumstances

---

presented fall beyond the exception's scope, we reverse.

The dispositive issue can be understood without a detailed recitation of the somewhat complex and inconsistent expert testimony adduced by the parties, and we need only mention the pertinent facts gleaned from a consideration of the record in the light most favorable to plaintiffs. On February 13, 1979, Jan Zukowski and his band, the Nighthawks, arrived at the Brief Encounter at 3:00 p.m. to set up their equipment for an evening performance and conduct a sound check to ascertain that the electrical, lighting, and public address systems were functioning properly. The test was coordinated by the band's audio engineer and stage manager, Glenn Kern, who found two strings of electrical conduits and receptacles leading from a circuit breaker panel located on the south wall of the stage. The bottom string, painted brown, connected four "quad" receptacle boxes, while the other, a shiny, unpainted string ran above the brown string between four "duplex" receptacles. Kern noted a gap between the second and third receptacle boxes on the old, brown conduit, and the conduit was discontinuous between the third and fourth box, which was dangling from wires running through the conduit. To avoid potential problems from the old conduit, Kern utilized only its first two boxes when connecting the band's instrument amplifiers, and he plugged the vocal microphones into the new conduit string to decrease the possibility of overloading a single circuit. During the sound check, while the band played their instruments and sang, a loud buzz or hum of varying intensity emanated from both the instrument amplifiers and the public address system, which was reduced though not totally eliminated by reversing the polarity switch on the harmonica player's amplifier. After the sound check the band's equipment was switched off but remained connected in the manner described above.

As the band began its performance at about 9:30, Jan Zukowski grasped a microphone with his right hand while touching the metal strings on his bass guitar and received a shock sufficiently strong to prevent releasing the microphone. The harmonica player grabbed the shielded microphone cord and yanked it from Jan's grasp, and as he did so there was a loud noise and a visible blue arc of electricity. Jan was taken to the dressing room to recuperate while audio engineer Kern inspected the electrical system and the band's equipment. Kern held an insulated shield on Jan's bass and touched it to the microphone, which caused a loud "pop" as well as a blue spark and pitted the metal on the guitar cable. He then conducted voltmeter tests of the band's equipment and the electrical system, which disclosed no problems with the band's amplifiers but indicated a leakage of seven to ten volts in the old conduit system and a difference in electric potential of approximately 206 volts between the old and new strings of conduit which should not have been present if the electrical system had been in proper working order. Because of his concerns about the old string of conduit, Kern plugged all the band's equipment into the new conduit, and the Nighthawks, including Jan Zukowski, completed their scheduled performance.

Approximately one month later, Jan Zukowski began experiencing pain in the region of his right hip and difficulty when walking, getting in and out of vehicles, or sitting for long periods of time. As time wore on the pain increased and it became more difficult to move about. In August 1979 his condition was diagnosed as bilateral avascular necrosis of the femoral heads which, according to plaintiffs' experts, was caused by the electrical shock he sustained while performing at the Brief Encounter. Jan Zukowski underwent two surgical procedures to treat his right hip, the first a MacMurray osteotomy and the second a total hip replacement.

Plaintiffs settled prior to trial with all defendants except Gladys Roth for $100,000 and proceeded against her on a theory of landlord liability for injuries sustained by a lessee's invitee on property leased for a "public use". The jury returned a verdict for plaintiffs, $150,000 for Jan and $20,000 for Theresa, and apportioned fault as follows: Jan, 30%; defendant, 70%; and

Theresa, zero. Defendant appealed, asserting among other things that the court erred in failing to grant her motion for directed verdict because the Brief Encounter was an "ordinary commercial establishment" and did not constitute a "public use" within the meaning of the exception to landlord immunity as developed in Missouri. We find this point well taken and dispositive of the cause on appeal.

It has long been held that a lessor is, under most circumstances, not liable for injuries to a tenant or a tenant's invitees caused by defects in the premises, regardless of whether they existed at the time possession was transferred to the lessee, and that the lease is, for purposes of the rule, regarded as equivalent to a sale of the premises for the duration of its term. *Warner v. Fry*, 360 Mo. 496, 228 S.W.2d 729, 730 (1950). Among several exceptions to this rule is the "public use" doctrine, which has received recognition but limited application in Missouri case law for at least 75 years. *See Bender v. Weber*, 157 S.W. 570, 574 (Mo.1913) (alleged hazard at grocery store not "condition dangerous to the general public, which condition appertained to a use by the owner intended to be public...."). In *Brown v. Reorganization Investment Co.*, 350 Mo. 407, 166 S.W.2d 476, 480 (1942), the only Missouri case in which a landlord has been held liable under the public use doctrine, the Court quoted the first *Restatement of Torts* § 359 (1934) for the proposition that:

> A lessor who leases land for a purpose which involves the admission of a large number of persons as patrons of his lessee is subject to liability for bodily harm caused to them by an artificial condition existing when the lessee took possession, if the lessor
> (a) knew or should have known of the condition and realized or should have re-

alized the unreasonable risk to them involved therein, and
> (b) had reason to expect that the lessee would admit his patrons before the land was put in reasonably safe condition for their reception.

The Court further stated "[o]ne who leases premises to be used as, or in connection with, a place of public amusement is liable for injuries to a patron caused by their defective and unsafe condition, where he knew or, in the use of reasonable care or diligence, could have known of such condition, and *especially is this so where the short and interrupted character of the lessee's occupation made it obvious that the safety of the premises must be left mainly to the lessor.*" *Id.* (quoting 62 C.J. 871, § 61) (emphasis added).

Although it is true that the *Restatement (Second) of Torts* § 359 (1977) no longer indicates that the public use must involve the admission of a large number of persons,[1] and some jurisdictions have interpreted the doctrine so broadly as to include almost any conceivable use involving admission of the public; *see* 52 C.J.S. *Landlord and Tenant* § 422(2)b; 49 Am.Jur.2d *Landlord and Tenant* § 782 et seq.; Annot. 17 A.L.R.3d 873; Prosser and Keaton, *The Law of Torts* § 63 (1986); Missouri decisions have continued to adhere to a limited application of the doctrine on a case by case basis utilizing a method of evaluation involving consideration of the number of persons admitted and distinguishing between those leases which involve "ordinary commercial establishments" and those contemplating a "public use". In *Warner*, 228 S.W.2d at 731, a case involving a tavern, it was noted "[s]ome courts have ... extended the meaning of the term 'public use' so that it would logically include every commercial use for which premises are open to

---

1. *Restatement (Second) of Torts* § 359 provides:
   A lessor who leases land for a purpose which involves the admission of the public is subject to liability for physical harm to persons who enter the land for that purpose by a condition of the land existing when the lessee takes possession, if the lessor
   (a) knows or by the exercise of reasonable care could discover that the condition in-

volves an unreasonable risk of harm to such persons, and
   (b) has reason to expect that the lessee will admit them before the land is put in a safe condition for this reception, and
   (c) fails to exercise reasonable care to discover or to remedy the condition, or otherwise to protect such persons against it.

the patronage of the public. We think [that view is] unsound." This Court proceeded to hold:

> a leasing for a 'public use,' which imposes such a duty, is one made for a purpose which contemplates the assembly of a large number of persons *at the same time* on the premises, either upon one or several occasions or continuously throughout the period of a lease.... Therefore, we hold that *the 'public use' rule does not apply to ordinary commercial establishments,* open to the patronage of such persons as may be attracted thereto as customers, the primary purpose of which is not to assemble large groups at the same time. There is a substantial difference between the two in the risk involved which we think should make a difference as to the duty of the owner, to persons coming on the leased premises, to have them in a reasonably safe condition at the time of the demise. Persons assembled in large groups have little opportunity to discover and avoid dangerous conditions and are less likely to be on the alert to avoid them. It is also less likely that they will be or can be warned of them by the lessee as they assemble.

*Id.* (emphasis added). While *Warner* illustrates the importance of the number of persons assembled on the premises as a factor in considering whether the lessee's business is an "ordinary commercial" establishment, *Clark v. Chase Hotel Co.,* 230 Mo.App. 739, 74 S.W.2d 498, 502 (1934), further indicates that the "public use" exception is applicable only to "place[s] of amusement." In *Clark,* the court held that a Turkish bath could not properly be classified as a place of amusement, and the lessor was not liable for plaintiff's injuries. More recent cases recognize both the number of patrons assembled and the nature of the use as considerations in determining whether the use is an "ordinary commercial establishment." *See Milne v. Pevely Dairy Co.,* 641 S.W.2d 158, 160 (Mo.App. 1982) (restaurant is ordinary commercial establishment); *Dunlap v. Howard,* 629 S.W.2d 664, 666 (Mo.App.1982) (service station is ordinary commercial establishment).

The general approach of Missouri decisions pertaining to the public use doctrine is clear, although, as is evident from an examination of the cases cited, not totally consistent with the position urged by the *Restatement (Second) of Torts* or adopted in some other states which recognize the exception to landlord immunity. Applying the pertinent legal principles as espoused in Missouri to the case at bar, we conclude that the Brief Encounter was an ordinary commercial establishment and its operation did not constitute a public use within the meaning of the doctrine. There was no evidence distinguishing the nightclub involved here from the restaurant in *Milne* or the tavern in *Warner* in any significant respect as to number of patrons or the nature of the use. Although some of plaintiffs' witnesses testified that "large" numbers of persons patronized the Brief Encounter, and that the crowd at the nightclub on the evening of Jan's accident was "fairly good-sized" or "very large," those assertions are too vague to distinguish the number of patrons at this establishment from those at a typical tavern or restaurant, which might also legitimately be described as attracting a large number of persons. The evidence here also fails to show that customers of the nightclub arrived and left at or near the same time rather than at various times during the evening; nor does it hint at the number of patrons who came solely to hear the band rather than listen to the recorded music played prior to and between performances or purchase the beverages served at the club. Plaintiffs also assert that the Brief Encounter was a place of public amusement, pointing out that "live" entertainment was always provided and noting that the nightclub was only open Thursday through Saturday of each week and occasionally on Wednesday; however, we do not find those factors, in and of themselves, a sufficient basis for distinguishing the Brief Encounter from the tavern in *Warner,* which, at least on occasion, provided recorded music or sports broadcasts for patrons, or from the typical restaurant or bar. The vague record here fails in

crucial respects to support a determination that the Brief Encounter is not an ordinary commercial establishment within the meaning of the public use doctrine.

Although plaintiffs rely heavily on *Brown*, an examination of the facts in that case highlights the absence of several factors critical to a finding of liability in the case at bar. In *Brown*, the lessee rented the Arena in St. Louis for a wrestling exhibition, a situation where the lessee's occupation of the premises is "short and interrupted" and it is "obvious that the safety of the premises must be left mainly to the lessor." 166 S.W.2d at 480. Here, however, the lessees were operating under a three-year lease, and their occupation of the premises was protracted and sustained.[2] It is also evident in *Brown* that the number of patrons attending the exhibition was "large" no matter how tightly the term is defined, and that the arrival of the audience roughly coincided with the beginning of the exhibition, factors not established in this case. Finally, a wrestling match certainly falls within the parameters of "public exhibition or amusement," and a lessee who rents a large arena is not engaged in operating an "ordinary commercial establishment." In contrast, so far as the evidence indicates, the Brief Encounter equates more nearly in nature to a typical bar or tavern, and is, like those businesses, an ordinary commercial establishment.

We believe plaintiffs failed to make a submissible case under long established Missouri law which we decline to abandon, and the trial court erred in failing to direct a verdict for defendant. Because of our determination that a public use was not involved here, we need not decide whether plaintiffs' cause of action was deficient in other respects as well; however, we note that there is some merit to defendant's contention that Jan Zukowski was not a member of the public on the premises for the purpose for which it was open to the public, that the stage itself was not an area used by the public, and that the alleged defect here posed no threat to patrons of the Brief Encounter. *See Horstman v. Glatt*, 436 S.W.2d 639, 643 (Mo.1969). The judgments are reversed.

BLACKMAR, DONNELLY, ROBERTSON and HIGGINS, JJ., SEILER, Senior Judge, and CRIST, Special Judge, concur.

BILLINGS, C.J., and WELLIVER, J., not sitting.

---

**2.** The Brief Encounter, a corporation formed in 1977 by Gladys Roth's son Ron Roth, Michael Kennedy and Dan Mattingly, initially leased the property in February 1977 from the owners, who were at that time the Proctor estate and Ron Roth. The original lease, with a term ending August 31, 1978, provided for a rent of only $250 per month to permit remodeling of the premises, and it contained a three-year renewal option. Under this lease, the Brief Encounter remodeled the building and opened for business in April 1977. Defendant Gladys Roth became owner of the property in July 1978, and the lease was renewed for three years effective September 1, 1978, at a rent of $600 per month.

Prior to acquiring ownership of the property in July 1978, Gladys Roth's only connection with the Brief Encounter was her agreement to guarantee rental payments under the original lease, although she was aware that the Brief Encounter was a tavern and nightclub. A clause of the lease provided that "Lessor reserves the right to make all reasonable examinations of said premises, and of the wiring and pipes in the same"; however, nothing in the evidence indicated Gladys Roth had actual knowledge of the allegedly defective wiring, and indeed she was only on the premises on one occasion, after the remodeling was completed.