**J.M., et al., Appellants,**

**v.**

**SHELL OIL COMPANY, Respondent.**

No. 78562.

Supreme Court of Missouri,
En Banc.

May 28, 1996.

Rehearing Denied June 25, 1996.

Mark E. Goodman and Sanford J. Boxerman, Clayton, for appellants.

Bruce D. Ryder, John R. Musgrave, Vincent H. Venker, II, and Daniel J. Carpenter, St. Louis, for respondent.

HOLSTEIN, Chief Justice.

Plaintiff J.M. was in the process of purchasing gasoline at a Shell convenience store and gasoline station in St. Louis County on October 25, 1992. She was abducted, sexually assaulted and shot in the head by an unidentified assailant. She was left for dead. However, she survived and brought this action. Defendant Shell Oil Company, the lessor and franchisor of the station, moved for summary judgment based on its claim that it was not a possessor of the property and had no right of control over H.T. Dunn Oil Company, the franchisee and lessee of the station. The trial court sustained the motion. Following opinion by the Missouri Court of Appeals, Eastern District, this Court granted transfer. The judgment is reversed.

I.

The record is viewed in a light most favorable to the non-movant, and the non-movant is given the benefit of all reasonable inferences. *ITT Commercial Fin. Corp. v. Mid–Am. Marine,* 854 S.W.2d 371, 382 (Mo. banc 1993). Where the record reasonably supports any inference other than those necessary to support a judgment for the movant, a genuine issue of material fact exists and the movant's motion for summary judgment should be overruled. *Id.*

Shell leases the land on which the station sits from the George Wilson Trust. Prior to March 1, 1991, Shell operated the station. In 1984, Shell had redesigned the station, adding a food mart. At that time, the attendant was moved from a cashier's kiosk in the center of the gas pumps to a place inside the food mart. There had been a number of robberies at the station prior to October of 1992, as well as other less serious crimes and disturbances at or near the station.[1]

On March 1, 1991, H.T. Dunn Oil Company leased the premises. In addition to a lease, Dunn and Shell entered into a dealer agreement. These documents contain detailed provisions regarding the operation of the station, including the following:

*Specified hours of operation:* Twenty-four hours each day.

. . . .

Dealer shall be responsible for maintaining, as Dealer's Station, a place of business suitable for the exercise of the rights granted Dealer hereunder which shall be of an architectural design, style, color scheme and layout acceptable to and approved by Shell as being in accordance with Shell's customary motor fuel station standards and specifications.... Without Shell's prior written approval, Dealer shall not make any alterations to Dealer's Station or construct any additional buildings or structures thereat.

---

1. Earlier motions for summary judgment filed on behalf of both Dunn and Shell asserted that the allegations were insufficient to support a breach of duty by possessors of land toward a business invitee arising out of the criminal acts of a third party. That issue is not before this Court on appeal and, therefore, is not addressed. The most recent discussion of the question by this Court is found in *Madden v. C & K Barbecue Carryout, Inc.,* 758 S.W.2d 59, 61 (Mo. banc 1988). *See also Restatement (Second) of Torts § 344 (1965).*

. . . .

Unless Dealer has already done so prior to Dealer's execution of this Agreement, Dealer shall ... satisfactorily complete Shell's initial training course designed for the operation of a motor fuel dispensing station.... Dealer shall, at Shell's request, subsequently participate in such advanced or refresher courses appropriate for a motor fuel dispensing station as Shell may offer from time to time.

. . . .

*Standards.* Dealer shall operate Dealer's Station according to the following standards of operation and appearance developed by Shell, but the means and manner of performance shall be within the sole discretion of Dealer:

. . . .

(c) *Staffing.* Dealer shall maintain an adequate and competent staff of employees, considering both the volume and nature of the business activity, to fulfill efficiently Dealer's obligations hereunder. Dealer shall have the responsibility to train Dealer's employees, and shall have available and utilize training equipment, materials and programs as made available by Shell from time to time for this purpose.

(d) *Customer Complaints.* Dealer shall conduct Dealer's operations in a professional and business-like manner in order to avoid customer complaints. Dealer shall promptly and courteously respond to any customer complaints received (including written responses, when appropriate) and take immediate action to correct or satisfactorily resolve each legitimate customer complaint.

(e) *Maintenance–Housekeeping.* Except as Shell may expressly have responsibility therefore under any separate agreement, Dealer shall at all times maintain Dealer's Station (including adjacent sidewalks and driveways, easements and all landscaped areas) and Dealer's own property and equipment thereat in good condition and repair, and keep the same (including the rest rooms) neat, clean, safe and orderly.

. . . .

(g) *Uniforms.* Dealer and Dealer's employees shall neatly wear clean uniforms of a type and style approved by Shell.

(h) *Lighting.* Dealer shall use sufficient lighting and illuminated signs to provide full visibility of Dealer's Station, including enclosed areas, at all times while open for operation.

. . . .

(i) *Signs.* Dealer shall have the right to display in a neat and orderly manner at Dealer's Station, but not affixed to the exterior of any building or the pole support(s) for the main identification sign(s), such briefly worded and professional-looking signs as are necessary to identify the products and services offered and their prices, but shall not display or use any other signs, posters, flags, pennants or other advertising devices without Shell's prior written approval, which shall not be unreasonably withheld.

(j) *Vending and Display.* Before installing or replacing any vending machines or display equipment for merchandising sundry convenience items at Dealer's Station, Dealer shall obtain Shell's prior written approval, which shall not be unreasonably withheld, as to its size, kind, appearance and placement. Video or other game machines are not permitted. Dealer shall not display or offer merchandise or paraphernalia which is morally offensive or distasteful to the general public.

(k) *Loitering.* Dealer shall keep Dealer's Station free from the loitering by persons who at the time have no proper business purposes thereon.

*Image Excellence Book.* Dealer acknowledges receipt from the Shell of

Shell's "Image Excellence" guidebook, which provides guidelines of objectives as to the operating and appearance standards established for Shell automobile service stations and motor fuel dispensing stations. Dealer shall maintain Dealer's Station in conformance with such book.... Shell may update such book from time to time by providing Dealer a copy of revised material....

. . . .

To the extent reasonably necessary to observe the terms of this Agreement, Shell shall have the right, at all reasonable times, to enter Dealer's Station and to inspect the same, as well as such part of Dealer's books and records as may be material to a proper inquiry hereunder.

Shell also distributed a "Health, Safety & Environment Manual" to its dealers. That manual required the reporting of robberies or customer injuries at the service station. Included in the training manuals supplied by Shell to its dealers was a "Robbery Deterrence and Safety Training Manual" covering such topics as robbery prevention, reaction to robberies and a post-robbery strategy. This manual sets out the details and the manner in which safety of the premises is to be achieved.

As part of its inspection program, Shell conducted service station health and safety reviews. One of the safety review check sheets reads in part:

Armed robberies have been increasing at service stations recently. A major deterrent to potential armed robbers is a clean, uncluttered and well-lit station where the cashier can see outside and be seen clearly ...; All cashiers/attendants should be thoroughly trained on how to respond during and after a robbery.

Pursuant to the above agreements and policy manuals, Shell representatives inspected the station at least monthly and conducted point-by-point reviews and counseling of Dunn representatives regarding various aspects of the station operations.

Notwithstanding the dealer agreement, the lease and the policy manuals regulating details of how Dunn was to operate the station, the dealer agreement also contains the following paragraph:

Dealer is an independent businessperson, and nothing in this Agreement shall be construed as reserving to Shell any right to exercise any control over, or to direct in any respect the conduct or management of, Dealer's business or operations conducted pursuant to this Agreement; but the entire control and direction of such business and operations shall be and remain in Dealer, subject only to Dealer's performance of the obligations of this Agreement.

The lease provides:

Nothing in this Lease shall be construed as reserving to Shell any right to exercise any control over, or to direct in any respect the conduct or management of, the business or operations of lessee on the Premises....

It is upon the basis of the last two quoted paragraphs that the trial court granted summary judgment, apparently concluding that Dunn was not a servant of Shell Oil and that Shell Oil was not a possessor of the property.

## II.

Under most circumstances, a lessor of land is not subject to liability for injuries to the business invitees of a tenant due to defects on the premises. *Warner v. Fry,* 228 S.W.2d 729, 730 (Mo.1950). The rule is not without exception, however. One such exception is the "public use" exception, which applies only to public exhibitions and entertainment contemplating the assembly of a large number of persons. 228 S.W.2d at 731; *Roth v. Zukowski,* 757 S.W.2d 581, 583–84 (Mo. banc 1988). Operation of a service station does not fall within that exception. *Dunlap v. Howard,* 629 S.W.2d 664, 666 (Mo. App.1982). The trial court correctly concluded that Dunn, not Shell, was the "possessor" of the leased premises because Dunn was in occupation of the premises. *Restatement (Second) of Torts § 328E (1965).*

### III.

Another exception to the general rule that a landlord is not liable is where the lessor exercised such control over the business operations of the leased premises that the lessee is treated as a servant of the lessor. Many factors are included in the calculus for determining if one person is the servant of another for purposes of establishing vicarious liability. However, the touchstone is whether the party sought to be held liable has the control or right to control the conduct of another in the performance of an act. *Balderas v. Howe*, 891 S.W.2d 871, 873–74 (Mo.App.1995); *Brenner v. Socony Vacuum Oil Co.*, 158 S.W.2d 171, 174 (Mo.App. 1942); *Restatement (Second) of Agency § 220(1)(1958)*. The liability of a lessor under the doctrine of respondeat superior for the acts of a lessee is dependent upon whether the lessor has the right to control the lessee. *Gardner v. Simmons*, 370 S.W.2d 359, 362 (Mo.1963). The control or right to control must extend to the physical activities of the lessee or to the details of the manner in which the work is done by the lessee on the premises. *Matteuzzi v. Columbus Partnership, L.P.*, 866 S.W.2d 128, 132 (Mo. banc 1993).

The negligent acts alleged in this case are that the defendants knew or should have known that the individual who abducted plaintiff was on its premises and by ordinary care could have prevented the abduction, that no security personnel were present, that no security system was available on the premises, that the design of the building was inadequate to detect criminal activity against business invitees, that there was no functioning closed-circuit television system, and that the employees were not trained to maintain adequate security for customers. Assuming, without deciding, that the above allegations give rise to a duty by Dunn to provide security for customers such as J.M., the critical question becomes whether Shell had the control or right to control Dunn in performing that duty.

Shell argues that this Court should construe the operator's agreement contract to establish as a matter of law that Shell had neither control nor the right to control Dunn's activities. However, the contractual terms are internally contradictory. Some provisions declare there is no agency or master/servant relationship. Other provisions give detailed guidance on such matters as reporting crime, architectural design, approved uniforms, loitering, lighting, display of products, vending machines, hours of operation, adequacy and training of staff, safety and orderliness of the premises, and routine inspections to ensure compliance with Shell's standard operating policies. Moreover, Shell could unilaterally change those policies by simply amending the contents of the "Image Excellence Book." At minimum, the agreements give rise to a factual question as to whether Shell had a right of control over Dunn in providing security for customers of the station. Plaintiff must still persuade a factfinder that Shell controlled or had the right to control Dunn's provision of security measures. *Bowman v. McDonald's Corp.*, 916 S.W.2d 270, 286 (Mo.App.1995).

Shell also argues that the reservation of right by a lessor to make repairs or improvements is insufficient to give rise to liability under the theory of respondeat superior. Assuming it is true that a landlord who reserves a right, but not a duty, to inspect, make repairs or construct improvements is not vicariously liable to the tenant's invitees for conditions on the premises, the agreements here involve far more than a mere reservation of those rights. Shell had extensive rights to regulate and actually did regulate many of the day-to-day activities at the station that are normally considered in the nature of business management, including activities that relate to customer security. These details give rise to a factual dispute as to Shell's right to control Dunn's provision of security at the station. The motion for summary judgment on that issue should have been overruled.

### IV.

Plaintiff argues three additional grounds of liability. The first is that Shell

was directly negligent when it redesigned the station in 1984 because it should have foreseen the potential of future crimes against customers of future dealers operating the station and taken those crimes into account in its design. No authority is cited for this dubious basis of liability and none is found.[2] In Missouri, a duty does not exist to protect business invitees from the criminal acts of third persons absent a "special relationship" or "special circumstances." *Miller v. South County Ctr., Inc.*, 857 S.W.2d 507, 510 (Mo. App.1973). The relationship between the designer of a building and a business invitee is not one of those previously recognized as a "special relationship" or "special circumstance." *Id.* at 511. We need not and, therefore, do not recognize such relationship as a basis for liability in this case.

■■■■ Another basis of direct liability claimed by plaintiff is that under *Restatement (Second) of Torts § 324A (1965)*, Shell failed in its duty to "render services ... necessary for the protection of a third person," when Shell undertook to train Dunn's employees. An undertaking to train employees of another, even in matters of security, is not equivalent to an undertaking to protect business invitees of the employer from crimes. It is conceivable that pursuant to § 324A, one who undertakes training for an employer may be directly liable under the "special circumstance" where the trainer gives an express assurance that business invitees of the employer will be safe. *See Miller v. South County Ctr.*, 857 S.W.2d 507, 512–13 (Mo.App.1993); *Thiele v. Rieter*, 838 S.W.2d 441 (Mo.App.1992); *Keenan v. Miriam Found.*, 784 S.W.2d 298, 303 (Mo.App. 1990). However, Shell's undertaking to provide training was not accompanied by its express assurance that Dunn's invitees would be safe. For that reason, this claim of direct liability fails.

■■■■ The third argument is that as a matter of public policy, this Court should create a presumption that a franchisor has the same liability as a franchisee for the security of the franchisee's customers because the franchisor has the power to select and control those who operate its businesses. As previously noted, the general rules of agency and tort provide adequate guidance for vicarious liability. No special rules for the liability of franchisors need be adopted.

### CONCLUSION

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

BENTON, LIMBAUGH, ROBERTSON, COVINGTON and WHITE, JJ., concur.

PRICE, J., not sitting.

---

2. The only case cited, *Chubb Group of Ins. v. C.F. Murphy & Assoc.*, 656 S.W.2d 766 (Mo.App. 1983), involves a collapsing building, not a criminal act by a third party.