**Mary Jo RITTER, individually and as Personal representative of the Estate of Robert D. Ritter, Jr., Appellant,**

v.

**BJC BARNES JEWISH CHRISTIAN HEALTH SYSTEMS, etc., Respondent.**

No. 73713.

Missouri Court of Appeals,
Eastern District,
Division Five.

Jan. 12, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 16, 1999.

Application to Transfer Denied
April 27, 1999.

Robert F. Ritter and Joan M. Lockwood, St. Louis, for appellant.

Thomas B. Weaver and Paul N. Venker, St. Louis, for respondent.

KENT E. KAROHL, Judge.

Plaintiff, Mary Jo Ritter (Ritter) individually and as personal representative of the Estate of Robert D. Ritter, Jr., appeals summary judgment in favor of Defendant, Barnes Jewish Christian Health Systems (BJC). Ritter sued BJC and other defendants alleging damages from injuries Robert D. Ritter, Jr. sustained while under the care and treatment of defendants, and for loss of consortium.

Ritter contends genuine issues of material fact exist as to whether BJC exerts control over Christian Hospital Northeast/Northwest (Christian Hospital) which would support finding BJC is liable on one or more theories of: (1) agency; (2) vicarious liability; (3) apparent authority; or (4) joint venture. In her sole point on appeal, Ritter argues that the trial court erred in granting summary judgment in favor of BJC. She argues that there are disputed issues of material fact, and that BJC is not entitled to judgment as a matter of law.

We affirm the decision of the trial court granting summary judgment.

## BACKGROUND

In April 1992, Barnes Hospital and The Jewish Hospital of St. Louis entered a System Affiliation Agreement. On June 1, 1993, the Affiliation Agreement was amended to include Christian Health Services Development Corporation, and several of its subsid-

iaries, as a member of the BJC System. Christian Hospital became a member of BJC under the Amended Affiliation Agreement. The Agreement designates BJC as the Parent Corporation, and each of the other entities admitted to the System as Institutions.

The BJC System was created in response to the rapidly changing health care field. The objective of the BJC System was to form an integrated regional health care delivery system capable of providing high quality, cost effective health services "that can successfully operate in a managed care marketplace." Additionally, the System was created to improve patient access to primary care medical services and specialized medical services. The parties sought to coordinate "clinical services, medical, nursing and other health professional education, research, fund raising, and centralized strategic planning, capital finance, marketing and such other administrative and management activities as [BJC] shall identify in order to enhance quality, reduce duplication of resources, increase efficiencies, maintain and improve the Institutions' financial posture, and decrease costs to health care consumers." Although the Affiliation Agreement addresses activities to connect the institutions under the BJC System, the Agreement specifically provides that the Institutions and Affiliates "retain their identities as separate institutions with unique traditions, constituencies and philanthropic support." Furthermore, the record indicates that BJC and Christian Hospital are separately incorporated under the laws of Missouri.

## TRIAL COURT PROCEEDINGS

On February 24, 1994, Robert D. Ritter, Jr. underwent laparoscopic gall bladder surgery at Christian Hospital. Mary Jo Ritter alleged in her petition that Mr. Ritter was injured as a result of negligent medical care surrounding his care and treatment. She filed a second amended petition and named BJC, among others, as a defendant. She alleged that BJC was liable because: (1) BJC controlled the care and treatment of Mr. Ritter through an agreement with Christian Hospital; (2) Christian Hospital was acting as the agent, actual or apparent, of BJC in Mr. Ritter's treatment; and (3) BJC and

Christian Hospital are (a) partners, and/or (b) engaged in a joint venture. BJC filed a motion to dismiss Ritter's second amended petition or, in the alternative, transfer and make more definite. The trial court consolidated this case with several other cases for the purpose of determining the issue of venue.

Ritter commenced comprehensive discovery with respect to the relationship of BJC to its affiliates. Thereafter, she filed a consolidated venue brief and suggestions in opposition to BJC's motion to dismiss and/or to change venue. After a hearing on the venue issue, the court issued an Order denying BJC's motion for the change of venue. It held that BJC could be found liable based upon the theory of respondeat superior, reasoning that Ritter stated a cause of action against BJC. However, it determined that it would be "a very fact intensive inquiry as to the degree of control which BJC could exercise over the details of the manner in which the work or services were performed by the member." Specifically, BJC must have had the right to control the particular treatment Mr. Ritter received. Ritter would have to rely on more than just the Affiliation Agreement to support her allegations. In making its decision, the court recognized that the standard in ruling on a change of venue motion is less stringent than the standard in a motion for summary judgment.

BJC moved for summary judgment alleging four grounds in support of its motion. First, BJC did not provide any health care to Mr. Ritter and cannot be liable as a principal for medical negligence. Second, BJC and Christian Hospital are two separate corporations and are not partners or agents of one another. Third, co-defendants David M. Margolis, M.D., Digestive Disease Specialist, Inc. and William D. Yates, M.D. are not agents of BJC. Fourth, Ritter cannot support a claim of medical negligence against BJC from her expert testimony. The trial court granted BJC's motion for summary judgment.

## AFFILIATION AGREEMENT

It is undisputed that Christian Hospital is a subsidiary of the Parent Corporation, BJC. When Christian Hospital became a subsid-

iary of BJC, an amended Affiliation Agreement was created. The Agreement enumerates powers of the Parent Corporation and the subsidiaries. It specifies that the most significant consideration of the system is the "willingness of the Institutions and Affiliates to provide Parent Corporation with sufficient authority over the Institutions and Affiliates." This consideration is to be met "while addressing adequately the individual needs of each Institution and Affiliate in maintaining and preserving its separate identity and responsiveness to its respective constituencies and communities." While the main objective is for the Institutions and Affiliates to embrace authority from the Parent Corporation, this is to be achieved while balancing the Institutions' autonomy. The Agreement states that the Institutions will retain their separate identities while functioning within an integrated health care delivery system. Specifically, with regard to medical staff, the Agreement set forth that "[e]ach Institution and Affiliate shall make its own decisions concerning the granting and renewal of medical staff membership and the granting and renewal of medical staff privileges. All such decisions shall be consistent with the requirements of this Agreement ... and with the policies established by Parent Corporation."

In achieving the Goals and Objectives of the System, the Parent Corporation may exercise some control over the operation of the subsidiary Institutions and Affiliates. Thus, the Agreement states that each Institution must amend its Corporate Documents to reflect a delegation of power in the Parent Corporation. One of the goals and objectives of the system is "to permit the Institutions and Affiliates to function and be recognized as integral components of a medical center of national stature and reputation in the areas of patient care, biomedical research, and health professional education." However, there is also an objective "[t]o enable the Institutions and Affiliates to retain their identities as separate institutions with unique traditions, constituencies and philanthropic support."

In the formation of the system, the Agreement provides that each Institution must amend its Corporate Documents to conform to the Agreement which would include a provision stating that the Parent Corporation is the sole corporate member of that Institution. The Parent Corporation has the authority to approve the proposed amendments of each Institution.

The Affiliation Agreement allocates powers and responsibilities between BJC and the Institutions and Affiliates. BJC's specifically enumerated powers relate to: (1) planning and implementation; (2) debt approval; (3) transfers of assets; (4) budget approval; (5) excessive expenditure approval; (6) creation of new health care services or new locations for the delivery of services; (7) mergers; (8) negotiations with third party payors; (9) member affiliations; (10) uniform human resources policies; (11) coordinated marketing and promotional policies; and, (12) appointment and removal rights for each member's president and senior executive officer in consultation with such members' board of directors. The powers specifically reserved to the Institutions include: (1) election of Institution directors; (2) establishing Institution committees; (3) developing annual operating and capital budget; (4) expenditures in ordinary course of business; (5) decisions regarding its personnel such as hiring and terminating; (6) decisions regarding the granting and renewal of medical staff membership and granting and renewal of medical staff privileges; (7) utilization review and quality improvement within its own facility; and, (8) endowments and fundraising.

Article IX of the Agreement provides for indemnification by the Institution. The section states:

*Section 9.1 Indemnification by Institution.* Each party agrees to indemnify and hold the other parties, and their respective directors and officers of each (collectively, a "Section 9.1 indemnified party") forever harmless from and against any and all liabilities, demands, claims, actions, or causes of action, assessments, judgments, losses, costs, damages or expenses, including reasonable attorneys' fees, sustained or incurred by a Section 9.1 indemnified party and not otherwise reimbursed by insurance (other than self-insurance) resulting from or arising out of or by virtue of:

. . . .

(b) The performance of any services rendered by such party, its Affiliates, or its employees, directors, officers, or agents which results in any bodily injury, sickness, disease, death or physical injury which is caused in whole or in part by the negligent or willful act of such party, its Affiliates, or its employees, directors, officers, or agents.

Under this provision of the Agreement, Institutions are indemnified for damages caused by any other Institution. We need not consider the effect of this paragraph on this case where we are informed Ritter has resolved her claims against Christian Hospital and the other defendants.

## WITNESS TESTIMONY

The deposition of Dr. Samuel Nussbaum, Executive Vice-president for Medical Affairs and System Integration, was before the court. Ritter argues that Nussbaum's testimony further evidences BJC's control or right to control over Christian Hospital's delivery of health care. Nussbaum testified that the individual entities take responsibility of the clinical services. On the question regarding "system integration," Nussbaum explained that system integration refers to the development of new services, not the specific delivery of those services by physicians. As far as BJC setting guidelines that the Institutions may follow, BJC may suggest guidelines, but they are usually those guidelines set by national organizations, such as nursing. He indicated, though, that each Institution across the system has different approaches to delivery of health care.

Ritter contends that Nussbaum's testimony would support a conclusion that BJC can impose "system-wide" practices or services on the Institutions. There was also evidence that BJC could direct Christian Hospital to close its OB–GYN department. However, the testimony made clear that any such measures would be performed based on quality, inordinate costs or varying services, not on the manner of care. Additionally, the Affiliation Agreement grants BJC the power to plan and implement the System's provision of clinical services and research, contingent on an "integrated, non-duplicative, and cost-effective basis." Moreover, BJC may only take these measures with the consent of the Institutions.

BJC requires skill level criteria for some of the health provider positions. For example, requiring certain physicians to be board certified. This pertains purely to requiring providers to have minimum skills. It does not pertain to how they deliver care.

Both the Affiliation Agreement and the testimony suggest that each Institution continued to exercise autonomy in the delivery of care. For example, each Institution has its own set of requirements in granting medical staff privileges. In Dr. Nussbaum's deposition, he referred to the fact that BJC can adopt human resources' policies in terms of setting pay scales for nurses and job descriptions. However, Nussbaum explained that the human resources' policies take into account the individual needs of each entity. A nurse may have a different set of requirements or conditions in the various Institutions, such as differences in salaries and the way the nurses are treated in terms of their responsibilities and skill sets.

## DISCUSSION

On appeal, Ritter argues that the trial court erred in granting summary judgment. She contends that material issues of fact exist to establish: (1) agency, (2) vicarious liability, (3) apparent authority, or (4) joint venture.

Our review of a motion for summary judgment is *de novo*. *ITT Commercial Finance v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The trial court based its judgment upon the record submitted and the law; therefore, we do not need to give deference to its order granting summary judgment. *Id.* A motion for summary judgment is granted when the record indicates that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 74.04. A defending party, BJC in this case, may establish a right to judgment by demonstrating: "(1) facts

that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support the movant's properly-pleaded affirmative defense." *Stitt by Stitt v. Raytown Sports Ass'n, Inc.*, 961 S.W.2d 927, 930 (Mo.App. W.D.1998); *ITT*, 854 S.W.2d at 381. After a movant has made a prima facie showing that it is entitled to judgment as a matter of law, the burden shifts to the non-movant to establish a genuine dispute as to the facts underlying the movant's right to judgment. *Id.* at 382. A genuine issue "exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." *Id.*

Ritter brought a claim for medical malpractice against BJC and other defendants. The elements of a prima facie case for medical malpractice are: "(1) an act or omission by the defendant that failed to meet the requisite medical standard of care; (2) the act or omission was performed negligently, and (3) a causal connection between the act or omission and the plaintiff's injury." *Lashmet v. McQueary*, 954 S.W.2d 546, 551 (Mo.App. S.D.1997). BJC argues in its motion for summary judgment that Ritter failed to establish these elements for a prima facie case of medical malpractice.

The first element of a claim for medical malpractice is an act or omission on the part of the defendant. Here, BJC is a corporation. As such, "[it] is an artificial being, and, as an entity it must act through an agent." *Standard of Beaverdale, Inc. v. Hemphill*, 746 S.W.2d 662, 663 (Mo.App. 1988). Edward B. Case, Executive Vice President of Finance and Administration, in an affidavit in support of BJC's motion for change of venue, swore BJC did not employ the physicians who performed Mr. Ritter's surgery. Therefore, BJC cannot be liable for Ritter's injuries through any relationship with the physicians.

(1) *Agency*

In support of her point on appeal, Ritter first argues that establishing a principal-agent relationship is a question of fact. In general, that relationship is a question of fact for the fact finder to determine. *Johnson v. Bi–State Development Agency*, 793 S.W.2d 864, 867 (Mo. banc 1990); *Tedesco v. Bekker*, 741 S.W.2d 896, 899 (Mo.App.1987). However, this relationship is a question of law for the court to determine when the material facts are not in dispute, and "only one reasonable conclusion can be drawn from the material facts." *Johnson*, 793 S.W.2d at 867.

Thus, the question is, are there sufficient summary judgment facts to support a finding that Christian Hospital acted as an agent of BJC? Generally, two separate corporations act as distinct legal entities, even if one partly or wholly owns stock in the other. *Mitchell v. K.C. Stadium Concessions, Inc.*, 865 S.W.2d 779, 784 (Mo.App. W.D.1993). In a parent-subsidiary relationship, the parent corporation is ordinarily not liable for tortious acts of the subsidiary corporation. *Id.* at 784. However, there is an exception to this rule when there is evidence to support a finding which would pierce the corporate veil. *Id.* Two factors must be met to pierce the corporate veil and disregard corporate forms: (1) the corporation must be controlled or influenced by another corporation; and (2) there must be evidence that the "corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetuate a fraud." *Thomas Berkeley Consulting Eng'r, Inc. v. Zerman*, 911 S.W.2d 692, 695–696 (Mo.App. E.D.1995). The control must not be over just finances; it must also be over the policy and business practice with respect to the particular transaction at issue. *Id.* In piercing the corporate veil, the wrong done must be the proximate cause of the injury of the party who dealt with the corporation. *Id.*

In Missouri, the corporate veil may be pierced when the corporate affiliation is conceived or "used to perpetuate fraud or injustice or accomplish some unlawful purpose." *Camelot Carpets v. Metro Distribut-*

*ing Co.*, 607 S.W.2d 746, 749 (Mo.App.1980) (quoting *Lawton–Byrne–Bruner Ins. Agency Co. v. Stiers Bros. Const. Co.*, 186 S.W.2d 480 (Mo.App.1945)). However, "[i]f the purpose to be served by the arrangement is fair and lawful, then legal forms and relationships are to be observed and the case determined upon the basis of separate and individual corporate existence." *Id.* Here, Ritter provided no summary judgment facts to support a finding of BJC entering a relationship with Christian Hospital to perpetuate fraud or injustice. Therefore, we conclude BJC's relationship with Christian Hospital perpetuated a separate and individual corporate existence. *Id.*

▮▮▮ In order to establish a principal-agent relationship between two corporate entities, "there must be such domination and control 'that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.'" *Sedalia Mercantile Bank and Trust Co. v. Loges Farms, Inc.*, 740 S.W.2d 188, 202 (Mo.App.1987) (quoting *Blackwell Printing Co. v. Blackwell–Wielandy Co.*, 440 S.W.2d 433, 437 (Mo.1969)). To hold a parent liable for its subsidiary's acts, "the control must be actual, participatory and total." *Sedalia Mercantile Bank*, 740 S.W.2d at 202–203. In *Sedalia Mercantile Bank*, the Western District of this court found that it was not enough that Sedalia Mercantile Bank follow credit guidelines of its parent corporation and had to submit a yearly loan review. *Id.* at 203. The court stressed that Sedalia Mercantile Bank was not dominated by the parent corporation to not have a separate mind or existence. *Id.*

Here, the Affiliation Agreement and witness testimony would support a finding that BJC exerts some control over Christian Hospital. However, the evidence also makes clear that it did so for business reasons, while observing autonomy in the individual entities. Although BJC has control over some of Christian Hospital's affairs and it participates in many of Christian Hospital's activities, it does not have control or right to control over medical care of patients at Christian Hospital. *See Id.* at 202–203; *J.M. v. Shell Oil Company*, 922 S.W.2d 759, 764 (Mo. banc 1996). In particular, BJC did not

have control or participate directly in Mr. Ritter's surgery. The evidence would not support a finding that BJC has actual, participatory or the right to control over Christian Hospital with respect to patient care including Mr. Ritter's surgery. Thus, there is no evidence to support finding an agency relationship between BJC and Christian Hospital.

### (2) *Vicarious Liability*

▮▮▮ Ritter next argues that BJC is vicariously liable for the acts that caused Mr. Ritter's injuries. The following elements are required to create an agency relationship sufficient to establish vicarious liability: (1) the principal must consent, expressly or impliedly, to the agent's acting on the principal's behalf; and, (2) the agent must be subject to the principal's control. *Wray by and through Wray v. Samuel U. Rodgers' Community Health Center*, 901 S.W.2d 167, 170 (Mo.App. W.D.1995). "[T]he touchstone is whether the party sought to be held liable has the control or right to control the conduct of another in the performance of an act." *J.M. v. Shell Oil Company*, 922 S.W.2d at 764. In order to find BJC vicariously liable for the acts of Christian Hospital, the control or right to control must relate to the "physical activities of [Christian Hospital] or to the details of the manner in which the work is done by [Christian Hospital]." *Id.*

In *J.M v. Shell Oil Company*, the plaintiff was abducted from a gas station, assaulted and raped. *Id.* She sued the oil company that leased land and sublet it to a franchisee. *Id.* Specifically, plaintiff claimed that the defendants were negligent in providing security measures that would have prevented her injuries. *Id.* Shell Oil Company moved for summary judgment on the grounds that it had no control over the franchisee. *Id.* In deciding this case, our Missouri Supreme Court analyzed whether Shell had the control or right to control the franchisee in performing the duties to the plaintiff. *Id.* It looked to the operator's agreement contract, and concluded that the terms of the contract were contradictory, with some terms providing for specific guidance on safety matters, while other provisions stated that there was no master/servant relationship. *Id.* It held

that the inconsistent terms gave rise to a factual question as to whether Shell had a right to control the franchisee in providing security measures for its customers. *Id.*

Ritter alleges negligent acts with respect to the medical, surgical, hospital and nursing care and treatment provided to Mr. Ritter while undergoing surgery at Christian Hospital. But the question is whether this may be the premise for liability of BJC. *Id.* at 764. Thus, in order to survive summary judgment, Ritter must produce a factual question sufficient to support a finding that BJC exercises sufficient control or has the contractual right to control Christian Hospital's performance of Mr. Ritter's surgery.

The Court in *J.M.* found a factual question as to whether Shell had the right to control the franchisee in providing security measures. Here, there is no inconsistent evidence on this issue. BJC has authority to direct the closure of medical departments, approve large expenditures, transfer assets, remove directors, and alter relationships between affiliates and third parties. However, the Affiliation Agreement and witness testimony will not support a finding that BJC could or did have any control over Christian Hospital in providing medical care for patients. BJC did not schedule the surgery. It did not choose or dictate to the providers how to perform Mr. Ritter's surgery or treat him before and after the surgery. Plaintiff has not alleged that a business decision by BJC breached a duty owed to them by BJC or caused Mr. Ritter's injury. Therefore, the nature of the business relationship between BJC and Christian Hospital is a question of law and the trial court did not err in rejecting the theory of vicarious liability. *Johnson,* 793 S.W.2d 864 at 867.

### (3) *Apparent Authority*

 Ritter also argues that the evidence raises a material issue of fact as to whether an apparent authority relationship exists between BJC and Christian Hospital. To establish apparent authority, a plaintiff relying on such authority must show: (1) the principal consented or knowingly permitted the agent to exercise authority; (2) the person relying on such authority in good faith had reason to believe and actually believed the agent possessed authority; and, (3) the person relying on the authority changed his position and will be injured if the principal is not bound by the transaction executed by the agent. *Earl v. St. Louis University,* 875 S.W.2d 234, 238 (Mo.App. E.D.1994). Apparent authority cannot be established on the acts of the agent alone. *Id.* The principal must have created an appearance of authority to be held liable for the acts of the agent. *Id.*

 A principal usually creates the appearance of authority by the following methods: (1) direct, express statements; (2) placing the agent in a "position" which, according to the ordinary habits of people in the locality, trade or profession, denotes a certain kind of authority; and, (3) authorizing an agent to carry out a course of acts, which gives the appearance that the agent is authorized to carry out subsequent acts. *Id.*

The summary judgment facts will not support finding the elements of apparent authority. Ritter points to the Affiliation Agreement and to documents that bear the BJC emblem to support her argument. However, the evidence merely suggests that Christian Hospital is an affiliate in the BJC system, a corporate status. It will not support a finding BJC consented or knowingly permitted Christian Hospital to perform Mr. Ritter's surgery. Even if Mr. Ritter, in good faith, may have had reason to believe that Christian Hospital possessed authority to act for BJC, there is no evidence to support a finding he actually believed Christian Hospital possessed authority. In addition, there is no evidence that would suggest Mr. Ritter changed his position in reliance on the alleged apparent authority.

Thus, Ritter did not provide sufficient evidence to maintain a disputed material fact with respect to agency, vicarious liability or apparent authority. Consequently, she failed to meet the first element of her claim for medical malpractice against BJC. *Lashmet,* 954 S.W.2d at 551. The trial court's ruling on BJC's motion for summary judgment was not erroneous on these theories. *Stitt by Stitt,* 961 S.W.2d at 930; *ITT,* 854 S.W.2d at 381.

#### (4) *Joint Venture*

 Ritter, in the alternative, argues that there is a joint venture between BJC and Christian Hospital. A joint venture is essentially "an association of two or more persons to carry out a single business enterprise for profit." *Eads v. Kinstler Agency, Inc.*, 929 S.W.2d 289, 292 (Mo.App. W.D. 1996). The elements of a joint venture are as follows: (1) an express or implied agreement among members of the association; (2) a common purpose to be carried out by the members; (3) a community of pecuniary interest in that purpose; and, (4) each member has an equal voice or an equal right in determining the direction of the enterprise. *Id.* The parties must intend to, and in fact do, create a contract of joint venture. *Jeff–Cole Quarries, Inc. v. Bell*, 454 S.W.2d 5, 16 (Mo. 1970). Indications of a joint venture include: actively participating and sharing in the profits, all parties having joint and several control, and having a duty to share the losses. *Id.*

 A plaintiff may show a joint venture by either an express agreement or an implied agreement. *Rosenfeld v. Brooks*, 895 S.W.2d 132, 135 (Mo.App. E.D.1995). An express agreement occurs when the parties make explicit promises. *Id.* Ritter argues that the Affiliation Agreement constitutes an express agreement to form a joint venture. However, in *Rosenfeld* we recognized that "[t]he existence of a different type of express contract is in itself inconsistent with a claimed relationship of a joint venture by implication." *Id.* Thus, courts will not imply a joint venture where the evidence indicates that the parties created a different business form. *Id.* "[T]he unequivocal existence of a definite business form is the most reliable expression of the relationship among the parties." *Id.* Here, there is no mention of a joint venture in the Affiliation Agreement. Moreover, BJC is described as a Missouri not-for-profit corporation in the Affiliation Agreement. Although Missouri courts hold that a corporation may be an arm of a joint venture, we will not imply this arrangement. *Id.* In *Rosenfeld*, we did not find a joint venture, reasoning that the plaintiff "has failed to properly show an express agreement for joint venture to rebut the presumption that the parties were operating solely under the express corporate form." *Id.* Ritter did not present any evidence to support finding an express or implied joint venture.

We have held that affiliation agreements among health care corporations do not necessarily form joint ventures. In *Dillard v. Rowland*, 520 S.W.2d 81 (Mo.App.1974), the plaintiff argued that an affiliation agreement between Barnes Hospital and Washington University created a joint venture. The plaintiff argued that the joint venture existed because Washington University provided medical staff to Barnes, and Barnes administered and managed its own hospitals and the hospitals owned by the University on a consolidated basis, dividing the net earnings and losses equally. *Id.* at 91. The court held that although the facilities are shared for mutual benefit, the agreement does not give either institution the right to control the operations of the other; therefore the agreement did not form a joint venture. *Id.*

Additionally, our Supreme Court has held affiliation agreements between health care institutions do not affect their status as independent entities. *Taylor v. Baldwin*, 362 Mo. 1224, 247 S.W.2d 741 (banc 1952). In *Taylor*, the appellant argued that the affiliation agreement between Barnard Free Skin and Cancer Hospital and Washington University would destroy the legal entity and functional integrity of Barnard. *Id.* at 751. The court observed that Barnard would benefit under the agreement in that it will have access, without charge and without incurring the annual expense of updating, to all of the surgical services and X-ray treatment facilities at the Washington University Medical Center. *Id.* at 752. Moreover, the Directors of Barnard will be able to continue to administer the intent of the founders of the charity. *Id.* Thus, the court held that the affiliation agreement does not change Barnard's status as an independent entity. *Id.*

 To further support Ritter's contention that BJC and Christian Hospital are engaged in a joint venture, she argues that a community of economic interest exists between the entities. Specifically, she points to

the clause which states that BJC "has the power to transfer assets (including operating surplus) among the Institutions, Affiliates and Parent Corporation...." Sharing profits and losses is evidence of a community of economic interest. *Jeff-Cole Quarries, Inc.*, 454 S.W.2d at 16. William Van Bokkelen, the President, Senior Executive, and a Director of Christian Hospital testified as follows:

Q. [Y]ou answered Mr. Tolin's question about the money from Christian and the other members pooling into an account that BJC had. Do you remember that question and answer?

A. Yes.

Q. Does each of the member hospitals, including Christian Hospital, have its own financial statement?

A. Yes.

Q. Could the dollars that are pooled into this account that you mentioned be traced back to each hospital?

A. Yes.

Q. And each hospital has a right to that money as identified through its own financial statements even though it's in this – pooled account?

A. That is correct.

Q. All right. And Christian Hospital hasn't agreed to share any profits with any other hospital in the system, has it?

A. No, it has not.

Q. It hasn't agreed to share any losses, either, has it?

A. No, it has not.

Mr. Van Bokkelen's undisputed testimony supports a finding there is no sharing of profit and losses between BJC and Christian Hospital to form a joint venture.

▆▆▆ Lastly, Ritter argues that BJC and Christian Hospital have an equal right of control in the direction of the enterprise. In order to form a joint venture the parties must have equal control over the enterprise. *Eads*, 929 S.W.2d at 292. Merely sharing an economic interest is not sufficient to form a joint venture. *Id.* There must be some evidence of the parties participating and having control over the enterprise. *Jeff-Cole Quarries*, 454 S.W.2d at 16. Black's Law Dictionary defines enterprise as "a business venture or undertaking." *Black's Law Dictionary*, 531 (6th ed.1990).

Ritter must establish that BJC and Christian Hospital have equal right to control health care delivery, the business venture or undertaking in which Christian Hospital is engaged. She must show that BJC participated in making decisions regarding delivery of health care and, in particular, Mr. Ritter's surgery. *Id.* There has been no such showing. Ritter merely argues that a right of control over budget matters and the board of directors is sufficient. Indirectly, these matters may have an effect on health care delivery, but they will not support a finding that BJC has the right to control the way in which Christian Hospital delivers health care. Thus, the trial court did not err in rejecting the theory of joint venture liability.

We affirm.

ROBERT G. DOWD, Jr., C.J. and ROBERT E. CRIST, Senior Judge, concur.